JOHN POTTER ET AL. *v.* CHICAGO PNEUMATIC
TOOL COMPANY ET AL.
(SC 15457)

Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued January 14—officially released May 27, 1997

*John W. Lemega* with whom were *John B. Farley* and, on the brief, *Michael S. Taylor* and *James V. Somers*, for the appellants-appellees (defendants).

*William F. Gallagher* with whom, on the brief, were *Stephen C. Embry, David N. Neusner, Elizabeth A. Gallagher* and *Evelyn A. Barnum,* for the appellees-appellants (plaintiff Joseph Gladu et al.).

*Opinion*

KATZ, J. This appeal arises from a products liability action brought by the plaintiffs[1] against the defendants, Chicago Pneumatic Tool Company (Chicago Pneumatic), Stanley Works and Dresser Industries, Inc. (Dresser). The plaintiffs claim that they were injured in the course of their employment as shipyard workers at the General Dynamics Corporation Electric Boat facility (Electric Boat) in Groton as a result of using pneumatic hand tools manufactured by the defendants. Specifically, the plaintiffs allege that the tools were defectively designed because they exposed the plaintiffs to excessive vibration, and because the defendants failed to provide adequate warnings with respect to the potential danger presented by excessive vibration.

The defendants appeal from the judgment rendered on jury verdicts in favor of the plaintiffs, claiming: (1) the interrogatories and accompanying instructions submitted to the jury were fundamentally prejudicial to the defendants; (2) the trial court improperly refused to direct a verdict for the defendants even though the jury's initial interrogatory responses demonstrated that several elements of the plaintiffs' claims had not been proven; (3) the trial court, as a result of inconsistencies in the jury's interrogatory responses, improperly submitted the case to the jury for reconsideration along with accompanying instructions that effectively directed the jury to return verdicts for the plaintiffs; (4) the trial court improperly instructed the jury that the defendants' state of the art defense applied only to the failure to warn claim and not to the design defect claim; (5) the trial court's instruction with respect to the

---

[1] For purposes of this opinion, the plaintiffs are Joseph Gladu, David Thompson, Roy Tutt, Thomas Brayman and Jaime Irizarry. They are among more than 400 individuals pursuing claims against the defendants. The named plaintiff, John Potter, is not a party to this appeal, the action as it pertained to him having been withdrawn prior to trial.

alteration or modification defense improperly shifted to the defendants the burden of disproving an essential element of the plaintiffs' case; (6) the trial court improperly instructed the jury that the alterations to the tools by the plaintiffs' employer would bar the defendants' liability only if these alterations had been the sole proximate cause of the plaintiffs' injuries; and (7) the trial court should have rendered judgment for the defendants notwithstanding the verdicts because (a) there was insufficient evidence that the tools were defective in that the plaintiffs had presented no evidence of a feasible alternative design, and (b) there was insufficient evidence that the defendants' tools reached the plaintiffs without a substantial change in condition.

In their cross appeal, the plaintiffs claim that the trial court: (1) unfairly prejudiced the plaintiffs' claim for punitive damages by excluding evidence, based on a misinterpretation of the parties' stipulation, of the number of other persons who allegedly had been injured by the defendants' tools; (2) improperly refused to issue a curative instruction after defense counsel suggested during closing argument that the plaintiffs had failed to produce an expert witness to testify that the tools were defective, although the trial court had granted the defendants' motion in limine precluding the plaintiffs from offering expert opinion evidence on that issue; (3) improperly permitted the jury to view irrelevant and prejudicial videotapes of the defendants' manufacturing process, which included narration concerning the defendants' quality control measures and safety testing procedures; and (4) improperly allowed the defendants to present evidence with respect to Electric Boat's safety practices. We transferred the appeal and the cross appeal from the Appellate Court to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We agree with the defendants that the trial court's instruction with respect to the alteration or mod-

ification defense improperly shifted to the defendants the burden of disproving an essential element of the plaintiffs' case. We therefore reverse the judgment of the trial court and order a new trial.

The trial record reveals the following facts, which are undisputed for purposes of this appeal. The plaintiffs were employed at Electric Boat as "grinders," positions which required use of pneumatic hand tools to smooth welds and metal surfaces.[2] In the course of their employment, the plaintiffs used various pneumatic hand tools, including chipping and grinding tools, which were manufactured and sold by the defendants. The plaintiffs' use of the defendants' tools at Electric Boat spanned approximately twenty-five years, from the mid-1960s until 1987. The plaintiffs suffer from permanent vascular and neurological impairment of their hands, which has caused blanching of their fingers, pain, numbness, tingling, reduction of grip strength, intolerance of cold and clumsiness from restricted blood flow. As a result, the plaintiffs have been unable to continue their employment as grinders and their performance of other activities has been restricted. The plaintiffs' symptoms are consistent with a diagnosis of hand arm vibration syndrome. Expert testimony confirmed that exposure to vibration is a significant contributing factor to the development of hand arm vibration syndrome, and that a clear relationship exists between the level of vibration exposure and the risk of developing the syndrome.

In addition to these undisputed facts, the following evidence, taken in favor of the jury's verdict, was presented. Ronald Guarneri, an industrial hygienist at Elec-

---

[2] One expert witness explained the design and purpose of these pneumatic tools: "[T]he machines are connected to an air hose that has air pressure, and you squeeze some kind of a valve and the air pressure is released into what's called an air motor, which is a turbine of sorts. The air propels the motor and rotates the grinding device and you apply the grinding wheel or attachment to the metal that you want to grind."

tric Boat, testified that he had conducted extensive testing of tools used at the shipyard in order to identify occupational hazards. This testing revealed that a large number of the defendants' tools violated the limits for vibration exposure established by the American National Standards Institute (institute), and exceeded the threshold limit promulgated by the American Conference of Governmental and Industrial Hygienists (conference).

Richard Alexander, a mechanical engineering professor at Texas A & M University, testified that because machinery vibration has harmful effects on machines and on people, engineers routinely research ways to reduce or to eliminate the amount of vibration that a machine produces when operated. Alexander discussed various methods available to control vibration, including isolation (the use of springs or mass to isolate vibration), dampening (adding weights to dampen vibrational effects), and balancing (adding weights to counterbalance machine imbalances that cause vibration). Alexander testified that each of these methods has been available to manufacturers for at least thirty-five years.

Alexander also stated that, in 1983, he had been engaged by another pneumatic tool manufacturer to perform testing of methods by which to reduce the level of vibration in its three horsepower vertical grinder. The vertical grinder had a live handle, which contained hardware for the air power, and a dead handle, which vibrated significantly more than the live handle because it weighed less. Alexander modified the design by inserting rubber isolation mounts between the handles and the housing, and by adding an aluminum rod to the dead handle to match the weight of the two handles. As a result of these modifications, which were published in 1987, Alexander achieved a threefold reduction in vibration levels.

The plaintiffs also presented the testimony of Charles Suggs, a research engineer at North Carolina State University, who has been investigating machinery vibration reduction since the 1960s. In 1968, Suggs published the first of several papers in which he discussed his success in reducing vibration hazards in chain saws by inserting rubber mounts between the handle and chain saw body. In the 1970s, he also published a series of articles reporting how he had reduced vibration by 70 percent in tools without handles by wrapping the tools with a resilient foam rubber material and a metal sleeve. Additionally, in 1988, Suggs tested the defendants' die grinders and, by applying the same technique, reduced the levels of vibration by between 35 and 60 percent. Additional facts will be presented as warranted.

After a six week trial, the trial court rendered judgment on jury verdicts in favor of the plaintiffs. Finding that the defendants' tools had been defectively designed so as to render them unreasonably dangerous, the jury awarded the plaintiffs compensatory damages.[3] The jury also concluded that the manufacturers had provided inadequate warnings. Because the plaintiffs failed to prove that adequate warnings would have prevented their injuries, the jury did not award damages on that claim. Finally, the jury declined to award the plaintiffs punitive damages. This appeal and cross appeal followed. Additional facts will be provided as warranted.

I

We first address the defendants' argument that the trial court improperly failed to render judgment for the

---

[3] Specifically, the jury awarded the plaintiffs compensatory damages in the following amounts: Joseph Gladu—$58,828 (reduced by 25 percent for comparative liability); David Thompson—$124,988 (reduced by 70 percent for comparative liability); Roy Tutt—$36,600 (with no reduction for comparative liability); Thomas Brayman—$65,400 (with no reduction for comparative liability); Jaime Irizarry—$60,289 (reduced by 20 percent for comparative liability).

defendants notwithstanding the verdicts because there was insufficient evidence for the jury to have found that the tools had been defectively designed. Specifically, the defendants claim that, in order to establish a prima facie design defect case, the plaintiffs were required to prove that there was a feasible alternative design available at the time that the defendants put their tools into the stream of commerce. We disagree.

In order properly to evaluate the parties' arguments, we begin our analysis with a review of the development of strict tort liability, focusing specifically on design defect liability. At common law, a person injured by a product had no cause of action against the manufacturer of the product unless that person was in privity of contract with the manufacturer. This rule, established in *Winterbottom* v. *Wright*, 152 Eng. Rep. 402 (1842), made privity a condition precedent to actions against manufacturers grounded in negligence. American courts widely adopted this rule and, for the next one-half century, the privity requirement remained steadfast in American jurisprudence.[4] 1 M. Madden, Products Liability (2d Ed. 1988) § 1.2, p. 8; see *Bragdon* v. *Perkins-Campbell Co.*, 87 F. 109, 110 (3d Cir. 1898) (outlining rule that vendor of products generally not liable to third parties); *Goodlander Mill Co.* v. *Standard Oil Co.*, 63 F. 400, 402 (7th Cir. 1894) (articulating general rule that liability does not attach to manufacturers absent contractual relationship).

The evolution of modern products liability law began with the landmark case of *MacPherson* v. *Buick Motor*

---

[4] Nevertheless, courts developed a number of exceptions to the privity requirement: (1) "an act of negligence . . . which is imminently dangerous to the life or health of mankind, and which is committed in the preparation or sale of an article intended to preserve, destroy, or affect human life"; *Huset* v. *J. I. Case Threshing Machine Co.*, 120 F. 865, 870 (8th Cir. 1903); (2) "an owner's act of negligence which causes injury to one who is invited by him to use his defective appliance upon the owner's premises"; id., 870–71; and (3) "one who sells or delivers an article which he knows to be imminently dangerous to life or limb to another without notice of its qualities." Id., 871.

*Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), in which the New York Court of Appeals extended the manufacturer's duty to all persons in fact harmed by products that were reasonably certain to cause injury when negligently made. As Justice Cardozo wrote in *MacPherson*, "[i]f the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully." Id., 389. The *MacPherson* reasoning eventually was accepted by nearly all American courts. See J. Wade, "Strict Tort Liability of Manufacturers," 19 Sw. L.J. 5 (1965).

Similarly, the New Jersey Supreme Court in *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), imposed "strict liability" upon the manufacturer of a defective product, but on a warranty basis. Discarding the antiquated notions of privity of contract, the court imposed upon the manufacturer an implied warranty of merchantability to a third party. Id., 373, 384. The *Henningsen* court stated: "We are convinced that the cause of justice in this area of the law can be served only by recognizing that [the third party] is such a person who, in the reasonable contemplation of the parties to the warranty, might be expected to become a user of the [product]. Accordingly, [the third party's] lack of privity does not stand in the way of prosecution of the injury suit against the [manufacturer]." Id., 413.

The next major development in products liability law did not attempt to modify the negligence rule any further, but, rather, urged its replacement. In *Escola* v. *Coca Cola Bottling Co. of Fresno*, 24 Cal. 2d 453, 461, 150 P.2d 436 (1944), Justice Roger Traynor, in a now

famous concurring opinion, first suggested that courts should hold manufacturers liable without fault when defective products cause personal injury. Justice Traynor asserted that strict liability would serve several policy justifications: (1) manufacturers could readily absorb or pass on the cost of liability to consumers as a cost of doing business; (2) manufacturers would be deterred from marketing defective products; and (3) injured persons, who lack familiarity with the manufacturing process, would no longer shoulder the burden of proving negligence. Id., 462.

Although Justice Traynor's argument did not prevail in *Escola*, nearly twenty years later he wrote for the majority in *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal. 2d 57, 62, 377 P.2d 897, 27 Cal. Rptr. 697 (1963), holding a manufacturer strictly liable because its defective product caused injury to the plaintiff. The *Greenman* court stated that "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." Id. The court explained that the purpose of this rule "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." Id., 63.

Two years later, § 402A of the Restatement (Second) of Torts adopted, with slight variation,[5] the doctrine of strict tort liability espoused in *Greenman*. Section 402A provides:

---

[5] Notably, the Restatement (Second) of Torts "eliminated the limitation that the product be one that the manufacturer knows will be used without inspection for defects. In addition, the Restatement version provides for the seller's liability for loss to property, other than to the defective product itself, even where there is no personal injury." 1 M. Madden, supra, § 6.1, pp. 191–92.

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." 2 Restatement (Second), Torts § 402A (1965).

Products liability law has thus evolved to hold manufacturers[6] strictly liable for unreasonably dangerous products that cause injury to ultimate users. Nevertheless, strict tort liability does not transform manufacturers into insurers, nor does it impose absolute liability. See R. Traynor, "The Ways and Meanings of Defective Products and Strict Liability," 32 Tenn. L. Rev. 363, 366–67 (1965) (emphasizing that manufacturers are not insurers for all injuries caused by products). As the Wisconsin Supreme Court has pointed out, "[f]rom the plaintiff's point of view the most beneficial aspect of the rule is that it relieves him of proving specific acts

---

[6] We recognize that, under General Statutes § 52-572m (a), " '[p]roduct seller' means any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term 'product seller' also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products." For purposes of simplicity, however, we will solely use the term "manufacturer."

of negligence and protects him from the defenses of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts." *Dippel* v. *Sciano*, 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967). Strict tort liability merely relieves the plaintiff from proving that the manufacturer was negligent and allows the plaintiff to establish instead the defective condition of the product as the principal basis of liability. See *Morningstar* v. *Black & Decker Mfg. Co.*, 162 W. Va. 857, 883, 253 S.E.2d 666 (1979); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 99, p. 695.

Although courts have widely accepted the concept of strict tort liability, some of the specifics of strict tort liability remain in question. In particular, courts have sharply disagreed over the appropriate definition of defectiveness in design cases.[7] As the Alaska Supreme Court has stated: "Design defects present the most perplexing problems in the field of strict products liability because there is no readily ascertainable external measure of defectiveness. While manufacturing flaws can be evaluated against the intended design of the product, no such objective standard exists in the design defect context." *Caterpillar Tractor Co.* v. *Beck*, 593 P.2d 871, 880 (Alaska 1979).

Section 402A imposes liability only for those defective products that are "unreasonably dangerous" to "the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." 2 Restatement (Second), supra, § 402A, comment (i). Under this formulation, known as the

---

[7] See generally P. Keeton, "Manufacturer's Liability: The Meaning of 'Defect' in the Manufacture and Design of Products," 20 Syracuse L. Rev. 559 (1969); P. Keeton, "Product Liability and the Meaning of Defect," 5 St. Mary's L.J. 30 (1973); G. Calabresi & J. Hirschoff, "Toward a Test for Strict Liability in Torts," 81 Yale L.J. 1055 (1972); S. Birnbaum, "Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence," 33 Vand. L. Rev. 593 (1980).

"consumer expectation" test, a manufacturer is strictly liable for any condition not contemplated by the ultimate consumer that will be unreasonably dangerous to the consumer. See *Rojas* v. *Lindsay Mfg. Co.*, 108 Idaho 590, 592, 701 P.2d 210 (1985); *Ritter* v. *Narragansett Electric Co.*, 109 R.I. 176, 190–91, 283 A.2d 255 (1971).

Some courts, however, have refused to adopt the "unreasonably dangerous" definition, determining that it injects a concept of foreseeability into strict tort liability, which is inappropriate in such cases because the manufacturer's liability is not based upon negligence. See *Caterpillar Tractor Co.* v. *Beck*, supra, 593 P.2d 882–83 (articulating that "unreasonably dangerous" narrows scope of recovery and unduly increases plaintiff's burden); *Cronin* v. *J.B.E. Olson Corp.*, 8 Cal. 3d 121, 133, 501 P.2d 1153, 104 Cal. Rptr. 433 (1972) ("[w]e think that a requirement that a plaintiff also prove that the defect made the product 'unreasonably dangerous' places upon him a significantly increased burden and represents a step backward").

In *Barker* v. *Lull Engineering Co.*, 20 Cal. 3d 413, 435, 573 P.2d 443, 143 Cal. Rptr. 225 (1978), the California Supreme Court established two alternative tests for determining design defect liability: (1) the consumer expectation analysis; and (2) a balancing test that inquires whether a product's risks outweigh its benefits. Under the latter, otherwise known as the "risk-utility," test, the manufacturer bears the burden of proving that the product's utility is not outweighed by its risks in light of various factors.[8] Three other jurisdictions have

---

[8] In evaluating the adequacy of a product's design, the *Barker* court stated that "a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Barker* v. *Lull Engineering Co.*, supra, 20 Cal. 3d 431.

subsequently adopted California's two-pronged test, including the burden-shifting risk-utility inquiry.[9] See *Caterpillar Tractor Co.* v. *Beck, supra,* 593 P.2d 884; *Ontai* v. *Straub Clinic & Hospital, Inc.,* 66 Haw. 237, 243, 650 P.2d 734 (1983); *Lamkin* v. *Towner,* 138 Ill. 2d 510, 529, 563 N.E.2d 449 (1990).

Other jurisdictions apply only a risk-utility test in determining whether a manufacturer is liable for a design defect. See, e.g., *Armentrout* v. *FMC Corp.,* 842 P.2d 175, 183 (Colo. 1992); *Radiation Technology, Inc.* v. *Ware Construction Co.,* 445 So. 2d 329, 331 (Fla. 1983); *Thibault* v. *Sears, Roebuck & Co.,* 118 N.H. 802, 807–809, 395 A.2d 843 (1978). To assist the jury in evaluating the product's risks and utility, these courts have set forth a list of nonexclusive factors to consider when deciding whether a product has been defectively designed.[10]

---

[9] Additionally, other states have adopted *Barker*-type alternative tests, but have declined to shift the burden of proving the product's risks and utility to the manufacturer. See, e.g., *Dart* v. *Wiebe Mfg., Inc.,* 147 Ariz. 242, 245–46, 709 P.2d 876 (1985); *Knitz* v. *Minster Machine Co.,* 69 Ohio St. 2d 460, 466, 432 N.E.2d 814, cert. denied, 459 U.S. 857, 103 S. Ct. 127, 74 L. Ed. 2d 110 (1982).

[10] These factors are typically derived from an influential article by Dean John Wade, in which he suggested consideration of the following factors:

"1. The usefulness and desirability of the product—its utility to the user and to the public as a whole.

"2. The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

"3. The availability of a substitute product which would meet the same need and not be as unsafe.

"4. The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

"5. The user's ability to avoid danger by the exercise of care in the use of the product.

"6. The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

"7. The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance." J. Wade,

With this history in mind, we turn to the development of strict products liability law in Connecticut. In *Garthwait* v. *Burgio*, 153 Conn. 284, 289–90, 216 A.2d 189 (1965), this court recognized a products liability cause of action sounding in tort and became one of the first jurisdictions to adopt the rule provided in § 402A. See J. Beasley, Products Liability and the Unreasonably Dangerous Requirement (1981) pp. 21, 201. In *Garthwait*, the court stated: "Where the liability is fundamentally founded on tort rather than contract there appears no sound reason why the manufacturer should escape liability simply because the injured user, a party in the normal chain of distribution, was not in contractual privity with it by purchase and sale." *Garthwait* v. *Burgio*, supra, 289. This court has further held that "[i]n order to recover under the doctrine of strict liability in tort the plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition. [2 Restatement (Second), supra, § 402A]; see *Rossignol* v. *Danbury School of Aeronautics, Inc.*, 154 Conn. 549, 562, 227 A.2d 418 [1967]." *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 234, 429 A.2d 486 (1980).

This court has long held that in order to prevail in a design defect claim, "[t]he plaintiff must prove that the product is unreasonably dangerous." Id. We have derived our definition of "unreasonably dangerous" from comment (i) to § 402A, which provides that "the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary con-

"On the Nature of Strict Tort Liability for Products," 44 Miss. L.J. 825, 837–38 (1973).

sumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." 2 Restatement (Second), supra, § 402A, comment (i). This "consumer expectation" standard is now well established in Connecticut strict products liability decisions. See, e.g., *Giglio* v. *Connecticut Light & Power Co.*, supra, 180 Conn. 234; *Slepski* v. *Williams Ford, Inc.*, 170 Conn. 18, 23, 364 A.2d 175 (1976); *Wachtel* v. *Rosol*, 159 Conn. 496, 500, 271 A.2d 84 (1970); *Rossignol* v. *Danbury School of Aeronautics, Inc.*, supra, 154 Conn. 562; *Liberty Mutual Ins. Co.* v. *Sears, Roebuck & Co.*, 35 Conn. Sup. 687, 690–91, 407 A.2d 1254 (1979).

The defendants propose that it is time for this court to abandon the consumer expectation standard and adopt the requirement that the plaintiff must prove the existence of a reasonable alternative design in order to prevail on a design defect claim. We decline to accept the defendants' invitation.

In support of their position, the defendants point to the second tentative draft of the Restatement (Third) of Torts: Products Liability (1995) (Draft Restatement [Third]), which provides that, as part of a plaintiff's prima facie case, the plaintiff must establish the availability of a reasonable alternative design. Specifically, § 2 (b) of the Draft Restatement (Third) provides: "[A] product is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe." The reporters to the Draft Restatement (Third) state that "[v]ery substantial authority supports the proposition that [the] plaintiff must establish a reasonable alternative design in order for a product to be adjudged defective in design." Draft

Restatement (Third), supra, § 2, reporters' note to comment (c), p. 50.

We point out that this provision of the Draft Restatement (Third) has been a source of substantial controversy among commentators. See, e.g., J. Vargo, "The Emperor's New Clothes: The American Law Institute Adorns a 'New Cloth' for Section 402A Products Liability Design Defects—A Survey of the States Reveals a Different Weave," 26 U. Mem. L. Rev. 493, 501 (1996) (challenging reporters' claim that Draft Restatement (Third)'s reasonable alternative design requirement constitutes "consensus" among jurisdictions); P. Corboy, "The Not-So-Quiet Revolution: Rebuilding Barriers to Jury Trial in the Proposed Restatement (Third) of Torts: Products Liability," 61 Tenn. L. Rev. 1043, 1093 (1994) ("[t]he decisional support for [the reasonable alternative design requirement], however, appears to be overstated by the Reporters, who claim that [eighteen] states support the rule"); F. Vandall, "The Restatement (Third) of Torts: Products Liability Section 2 (b): The Reasonable Alternative Design Requirement," 61 Tenn. L. Rev. 1407, 1428 (1994) ("The centerpiece of the Restatement (Third) of Torts: Products Liability is the requirement that the plaintiff present evidence of a reasonable alternative design as part of her prima facie case. This requirement is not supported by the majority of the jurisdictions that have considered the question."). Contrary to the rule promulgated in the Draft Restatement (Third), our independent review of the prevailing common law reveals that the majority of jurisdictions *do not* impose upon plaintiffs an absolute requirement to prove a feasible alternative design.[11]

[11] Our research reveals that, of the jurisdictions that have considered the role of feasible alternative designs in design defect cases: (1) six jurisdictions affirmatively state that a plaintiff need not show a feasible alternative design in order to establish a manufacturer's liability for design defect; see *Karns* v. *Emerson Electric Co.*, 817 F.2d 1452, 1457 (10th Cir. 1987) (applying

In our view, the feasible alternative design requirement imposes an undue burden on plaintiffs that might preclude otherwise valid claims from jury consideration.[12] Such a rule would require plaintiffs to retain an expert witness even in cases in which lay jurors can

Oklahoma law); *French* v. *Grove Mfg. Co.*, 656 F.2d 295, 297 (8th Cir. 1981) (applying Arkansas law); *Kallio* v. *Ford Motor Co.*, 407 N.W.2d 92, 94–97 (Minn. 1987); *Rahmig* v. *Mosley Machinery Co.*, 226 Neb. 423, 441, 412 N.W.2d 56 (1987); *Couch* v. *Mine Safety Appliances Co.*, 107 Wash. 2d 232, 239, 728 P.2d 585 (1986); *Sumnicht* v. *Toyota Motor Sales, U.S.A., Inc.*, 121 Wis. 2d 338, 370–71, 360 N.W.2d 2 (1984); (2) sixteen jurisdictions hold that a feasible alternative design is merely one of several factors that the jury may consider in determining whether a product design is defective; see *Dart* v. *Wiebe Mfg., Inc.*, 147 Ariz. 242, 245, 709 P.2d 876 (1985); *Camacho* v. *Honda Motor Co., Ltd.*, 741 P.2d 1240, 1247–48 (Colo. 1987), cert. dismissed, 485 U.S. 901, 108 S. Ct. 1067, 99 L. Ed. 2d 229 (1988); *Warner Fruehauf Trailer Co.* v. *Boston*, 654 A.2d 1272, 1277 (D.C. App. 1995); *Radiation Technology, Inc.* v. *Ware Construction Co.*, supra, 445 So. 2d 331; *Banks* v. *ICI Americas, Inc.*, 264 Ga. 732, 736, 450 S.E.2d 671 (1994); *Chown* v. *USM Corp.*, 297 N.W.2d 218, 220–21 (Iowa 1980); *Jenkins* v. *Amchem Products, Inc.*, 256 Kan. 602, 636, 886 P.2d 869 (1994), cert. denied, 516 U.S. 820, 116 S. Ct. 80, 133 L. Ed. 2d 38 (1995); *Montgomery Elevator Co.* v. *McCullough*, 676 S.W.2d 776, 780–81 (Ky. 1984); *McCourt* v. *J. C. Penney Co.*, 103 Nev. 101, 104, 734 P.2d 696 (1987); *Thibault* v. *Sears, Roebuck & Co.*, supra, 118 N.H. 807; *Cepeda* v. *Cumberland Engineering Co.*, 76 N.J. 152, 174–75, 386 A.2d 816 (1978); *Brooks* v. *Beech Aircraft Corp.*, 120 N.M. 372, 902 P.2d 54, 61 (1995); *Wilson* v. *Piper Aircraft Corp.*, 282 Or. 61, 71 n.5, 577 P.2d 1322 (1978); *Claytor* v. *General Motors Corp.*, 277 S.C. 259, 265, 286 S.E.2d 129 (1982); *Peterson* v. *Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 913 (S.D. 1987); *Morningstar* v. *Black & Decker Mfg. Co.*, supra, 162 W. Va. 887; (3) three jurisdictions require the defendant, not the plaintiff, to prove that the product was not defective; see *Caterpillar Tractor Co.* v. *Beck*, supra, 593 P.2d 884; *Barker* v. *Lull Engineering Co.*, supra, 20 Cal. 3d 431–32; *Ontai* v. *Straub Clinic & Hospital, Inc.*, supra, 66 Haw. 242–43; and (4) eight jurisdictions require that the plaintiff prove a feasible alternative design in order to establish a prima facie case of design defect; see *General Motors Corp.* v. *Edwards*, 482 So. 2d 1176, 1191 (Ala. 1985); *Owens* v. *Allis-Chalmers Corp.*, 414 Mich. 413, 426–27, 326 N.W.2d 372 (1982); *Voss* v. *Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108, 450 N.E.2d 204, 463 N.Y.S.2d 398 (1983); see also Ill. Comp. Stat. Ann. c. 735, 5/2-2104 (West Sup. 1996); La. Rev. Stat. Ann. § 9:2800.56 (West 1991); Miss. Code Ann. § 11-1-63 (f) (ii) (Cum. Sup. 1996); Ohio Rev. Code Ann. § 2307.75 (F) (Banks-Baldwin 1994); Tex. Civ. Prac. & Rem. Code Ann. § 82.005 (West Sup. 1997).

[12] Indeed, as one commentator has pointed out: "Apparently, without expert evidence in [the] plaintiff's prima facie case, [the] defendant would

infer a design defect from circumstantial evidence. Connecticut courts, however, have consistently stated that a jury may, under appropriate circumstances, infer a defect from the evidence without the necessity of expert testimony. See, e.g., *Standard Structural Steel Co.* v. *Bethlehem Steel Corp.*, 597 F. Sup. 164, 183 (D. Conn. 1984) (recognizing Connecticut law permits fact finder to draw inference of defect from circumstantial evidence); *Living & Learning Centre, Inc.* v. *Griese Custom Signs, Inc.*, 3 Conn. App. 661, 664, 491 A.2d 433 (1985) ("It is not necessary that the plaintiff in a strict tort action establish a specific defect as long as there is evidence of some unspecified dangerous condition. In the absence of other identifiable causes, evidence of malfunction is sufficient evidence of a defect under § 402A of the Second Restatement of Torts."); *Kileen* v. *General Motors Corp.*, 36 Conn. Sup. 347, 349, 421 A.2d 874 (1980) ("[t]he fact finder can find, where other identifiable causes are absent, that the mere evidence of a malfunction is sufficient evidence of a defect"); see also annot., 65 A.L.R.4th 346, 354–58 (1988) (listing twenty-eight states that allow establishment of prima facie case of design defect based upon inferences from circumstantial evidence).[13]

be entitled to a directed verdict. This is despite the advice in comment (d) [of the Draft Restatement (Third), supra] that, due to [the] plaintiff's limited access to relevant data, [the] plaintiff should not be required to make a detailed showing. Moreover, it is clear that defendants will hold plaintiffs to their burden of showing the alternative design to be reasonable considering the 'overall safety of the entire product.' In short, the proposed standard requires the plaintiff to put on a case to the judge supporting a product the defendant did not make. Only then will the plaintiff be permitted to place the merits of his or her case before the jury. Worse yet, due to the added cost and risk of a directed verdict, some plaintiffs with meritorious claims will not reach the jury, and others may not find representation at all." P. Corboy, supra, 61 Tenn. L. Rev. 1095–96.

[13] Indeed, consistent with this line of authority, the trial court in the present case instructed the jury that "[i]f there is persuasive evidence of an unreasonably dangerous condition that—it is not necessary that there be specific evidence of a specific defect, the product is still unreasonably dangerous, and thus, defective."

Moreover, in some instances, a product may be in a defective condition unreasonably dangerous to the user even though no feasible alternative design is available. In such instances, the manufacturer may be strictly liable for a design defect notwithstanding the fact that there are no safer alternative designs in existence. See, e.g., *O'Brien* v. *Muskin Corp.*, 94 N.J. 169, 184, 463 A.2d 298 (1983) ("other products, including some for which no alternative exists, are so dangerous and of such little use that . . . a manufacturer would bear the cost of liability of harm to others"); *Wilson* v. *Piper Aircraft Corp.*, 282 Or. 61, 71 n.5, 577 P.2d 1322 (1978) ("Our holding should not be interpreted as a requirement that [the practicability of a safer alternative design] must in all cases weigh in [the] plaintiff's favor before the case can be submitted to the jury. There might be cases in which the jury would be permitted to hold the defendant liable on account of a dangerous design feature even though no safer design was feasible (or there was no evidence of a safer practicable alternative)."); *Sumnicht* v. *Toyota Motor Sales, U.S.A., Inc.*, 121 Wis. 2d 338, 371, 360 N.W.2d 2 (1984) ("[a] product may be defective and unreasonably dangerous even though there are no alternative, safer designs available"). Accordingly, we decline to adopt the requirement that a plaintiff must prove a feasible alternative design as a sine qua non to establishing a prima facie case of design defect.

Although today we continue to adhere to our long-standing rule that a product's defectiveness is to be determined by the expectations of an ordinary consumer, we nevertheless recognize that there may be instances involving complex product designs in which an ordinary consumer may not be able to form expectations of safety. See 1 M. Madden, supra, § 6.7, p. 209 (noting difficulty in "determining in particular instances the reasonable expectation of the consumer"); W. Pro-

sser & W. Keeton, supra, § 99, pp. 698–99 (discussing ambiguity of consumer expectation test and shortcomings in its application). In such cases, a consumer's expectations may be viewed in light of various factors that balance the utility of the product's design with the magnitude of its risks. We find persuasive the reasoning of those jurisdictions that have modified their formulation of the consumer expectation test by incorporating risk-utility factors into the ordinary consumer expectation analysis. See, e.g., *Reed* v. *Tiffen Motor Homes, Inc.*, 697 F.2d 1192, 1196–97 (4th Cir. 1982) (applying South Carolina law); *Koske* v. *Townsend Engineering Co.*, 551 N.E.2d 437, 440–41 (Ind. 1990); *Aller* v. *Rodgers Machinery Mfg. Co.*, 268 N.W.2d 830, 835 (Iowa 1978); *Jenkins* v. *Amchem Products, Inc.*, 256 Kan. 602, 636, 886 P.2d 869 (1994), cert. denied, 516 U.S. 820, 116 S. Ct. 80, 133 L. Ed. 2d 38 (1995); *Seattle-First National Bank* v. *Tabert*, 86 Wash. 2d 145, 154, 542 P.2d 774 (1975). Thus, the modified consumer expectation test provides the jury with the product's risks and utility and then inquires whether a reasonable consumer would consider the product unreasonably dangerous. As the Supreme Court of Washington stated in *Seattle-First National Bank* v. *Tabert*, supra, 154, "[i]n determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue."[14] Accordingly, under this modified formulation, the consumer expectation test would establish the product's risks and utility, and

---

[14] This standard was subsequently incorporated into the Washington product liability statutes. See Wash. Rev. Code § 7.72.030 (1) (a) (1996); see also *Falk* v. *Keene Corp.*, 113 Wash. 2d 645, 651–53, 782 P.2d 974 (1989).

the inquiry would then be whether a reasonable consumer would consider the product design unreasonably dangerous.[15]

In our view, the relevant factors that a jury *may* consider include, but are not limited to, the usefulness of the product, the likelihood and severity of the danger posed by the design, the feasibility of an alternative design, the financial cost of an improved design, the ability to reduce the product's danger without impairing its usefulness or making it too expensive, and the feasibility of spreading the loss by increasing the product's price. See *Barker* v. *Lull Engineering Co.*, supra, 20 Cal. 3d 431; *Banks* v. *ICI Americas, Inc.*, 264 Ga. 732, 736 n.6, 450 S.E.2d 671 (1994); J. Wade, "On the Nature of Strict Tort Liability for Products," 44 Miss. L.J. 825, 837–38 (1973). The availability of a feasible alternative design is a factor that the plaintiff may, rather than must, prove in order to establish that a product's risks outweigh its utility. See, e.g., *French* v. *Grove Mfg. Co.*, 656 F.2d 295, 297 (8th Cir. 1981); *Armentrout* v. *FMC Corp.*, supra, 842 P.2d 185; *Sumnicht* v. *Toyota Motor Sales, U.S.A., Inc.*, supra, 121 Wis. 2d 371.

Furthermore, we emphasize that our adoption of a risk-utility balancing component to our consumer expectation test does not signal a retreat from strict

[15] Under this formulation, a sample jury instruction could provide: "A product is unreasonably dangerous as designed, if, at the time of sale, it is defective to an extent beyond that which would be contemplated by the ordinary consumer. In determining what an ordinary consumer would reasonably expect, you should consider the usefulness of the product, the likelihood and severity of the danger posed by the design, the feasibility of an alternative design, the financial cost of an improved design, the ability to reduce the product's danger without impairing its usefulness or making it too expensive, and the feasibility of spreading the loss by increasing the product's price or by purchasing insurance, and such other factors as the claimed defect indicate are appropriate." See *Couch* v. *Mine Safety Appliances Co.*, 107 Wash. 2d 232, 235–36, 728 P.2d 585 (1986); see also *Giglio* v. *Connecticut Light & Power Co.*, supra, 180 Conn. 234 (outlining consumer expectation test).

tort liability. In weighing a product's risks against its utility, the focus of the jury should be on the product itself, and not on the conduct of the manufacturer.[16] See *Dart* v. *Wiebe Mfg., Inc.*, 147 Ariz. 242, 246, 709 P.2d 876 (1985); *Aller* v. *Rodgers Machinery Mfg. Co.*, supra, 268 N.W.2d 835.

Although today we adopt a modified formulation of the consumer expectation test, we emphasize that we do not require a plaintiff to present evidence relating to the product's risks and utility in every case. As the California Court of Appeals has stated: "There are certain kinds of accidents—even where fairly complex machinery is involved—[that] are so bizarre that the average juror, upon hearing the particulars, might reasonably think: 'Whatever the user may have expected from that contraption, it certainly wasn't that.' " *Akers* v. *Kelley Co.*, 173 Cal. App. 3d 633, 651, 219 Cal. Rptr. 513 (1985). Accordingly, the ordinary consumer expectation test is appropriate when the everyday experience of the particular product's users permits the inference that the product did not meet minimum safety expectations. See *Soule* v. *General Motors Corp.*, 8 Cal. 4th 548, 567, 882 P.2d 298, 34 Cal. Rptr. 2d 607 (1994).

Conversely, the jury should engage in the risk-utility balancing required by our modified consumer expectation test when the particular facts do not reasonably permit the inference that the product did not meet the safety expectations of the ordinary consumer. See id., 568. Furthermore, instructions based on the ordinary consumer expectation test would not be appropriate when, as a matter of law, there is insufficient evidence to support a jury verdict under that test. See id. In such

---

[16] As Dean Keeton has stated, "[t]he change in the substantive law as regards the liability of makers of products and other sellers in the marketing chain has been from fault to defect. The plaintiff is no longer required to impugn the maker, but he is required to impugn the product." P. Keeton, "Product Liability and the Meaning of Defect," 5 St. Mary's L.J. 30, 33 (1973).

circumstances, the jury should be instructed solely on the modified consumer expectation test we have articulated today.

In this respect, it is the function of the trial court to determine whether an instruction based on the ordinary consumer expectation test or the modified consumer expectation test, or both, is appropriate in light of the evidence presented. In making this determination, the trial court must ascertain whether, under each test, there is sufficient evidence as a matter of law to warrant the respective instruction. See *Wassell* v. *Hamblin*, 196 Conn. 463, 470–71, 493 A.2d 870 (1985) (trial court may not instruct jury on issue that is unsupported by evidence).

With these principles in mind, we now consider whether, in the present case, the trial court properly instructed the jury with respect to the definition of design defect for the purposes of strict tort liability. The trial court instructed the jury that a manufacturer may be strictly liable if the plaintiffs prove, among other elements, that the product in question was in a defective condition, unreasonably dangerous to the ultimate user.[17] The court further instructed the jury that, in

---

[17] With respect to the appropriate test for determining a design defect, the trial court's instruction provided: "A defective product is defined as one that is unreasonably dangerous for its . . . intended use. *Unreasonably dangerous means dangerous to an extent beyond that which would be contemplated by the user.* The manufacturer is not required to guarantee that his product is incapable of doing harm. Therefore, the mere happening of an injury does not create legal responsibility on the part of a manufacturer. The law does not require the manufacturer to produce a product which is accident free or foolproof. A manufacturer's duty is to produce a product which is reasonably safe.

"Now, under the doctrine of strict liability, the plaintiff must establish each of the following five elements by a fair preponderance of the evidence: One, that the defendant engaged in the business of selling the product. Now, that is not in dispute, so you don't have to concern yourselves with that. That's been acknowledged. Second, that the product was in a defective condition, unreasonably dangerous to the user. Third, that the defect caused the injuries for which compensation is sought. Fourth, that the defect existed

determining whether the tools were unreasonably dangerous, it may draw its conclusions based on the reasonable expectations of an ordinary user of the defendants' tools. Because there was sufficient evidence as a matter of law to support the determination that the tools were unreasonably dangerous based on the ordinary consumer expectation test, we conclude that this instruction was appropriately given to the jury.

"Evidence is sufficient to sustain a verdict where it induces in the mind of the [trier] that it is more probable than otherwise that the fact in issue is true. . . . It is the province of the trier of fact to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . On appellate review, therefore, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . In analyzing a sufficiency of the evidence claim, the test that we employ is whether, on the basis of the evidence before the jury, a reasonable and properly motivated jury could return the verdict that it

---

at the time of the sale. And five, that the product was expected to and did reach the plaintiff without substantial change in condition.

"You must first determine that each defendant was engaged in the business of selling the product, which has been acknowledged. You must next determine whether the product was in a defective condition. A product is in a defective condition if it leaves the seller's hand in a condition that will be unreasonably dangerous to the ultimate consumer or user. Accordingly, a product may be defective even though it was manufactured in the way it was intended to be manufactured and even though it was perfectly made according to the manufacturer's own standards and tolerances, as long as the product is unreasonably dangerous when used for its intended and foreseeable purposes.

\* \* \*

"*It is for you to draw your own conclusions as to the reasonable expectations of an ordinary user of the defendants' products and as to the knowledge common to the community at large regarding these products.* It is the unreasonably dangerous condition of the product that makes the product defective, not whether the manufacturer or supplier knew the product was unreasonably dangerous. Therefore, the plaintiffs [do] not need to show that the seller knew the product was defective." (Emphasis added.)

did." (Citations omitted; internal quotation marks omitted.) *Baker* v. *Cordisco*, 37 Conn. App. 515, 528, 657 A.2d 230, cert. denied, 234 Conn. 907, 659 A.2d 1207 (1995).

"Whether a product is unreasonably dangerous is a question of fact to be determined by the jury. . . . [T]he jury can draw their own reasonable conclusions as to the expectations of the ordinary consumer and the knowledge common in the community at large." (Citation omitted; internal quotation marks omitted.) *Giglio* v. *Connecticut Light & Power Co.*, supra, 180 Conn. 235. Furthermore, "[i]t is not necessary that the plaintiff in a strict tort action establish a specific defect as long as there is evidence of some unspecified dangerous condition." *Living & Learning Centre, Inc.* v. *Griese Custom Signs, Inc.*, supra, 3 Conn. App. 664; see *Elliot* v. *Sears, Roebuck & Co.*, 30 Conn. App. 664, 672–73, 621 A.2d 1371 (1993), aff'd, 229 Conn. 500, 642 A.2d 709 (1994). The jury heard testimony that Guarneri, Electric Boat's industrial hygienist, had performed extensive testing of tools used at the shipyard, which tests revealed that a large number of the defendants' tools violated the institute's limits for vibration exposure and exceeded the conference's threshold limit. The jury also heard substantial testimony with respect to various methods, including isolation, dampening and balancing, available to reduce the deleterious effects of vibration caused by the defendants' tools. Moreover, there was expert testimony that exposure to vibration is a significant contributing factor to the development of hand arm vibration syndrome and that a clear relationship exists between the level of vibration exposure and the risk of developing the syndrome. Viewing the evidence in a light favorable to supporting the jury's verdicts, as we must, we conclude that the jury properly determined that the defendants' tools had been defectively designed.

## II

We next consider the defendants' claims relating to substantial modification. Specifically, the defendants argue that: (1) the trial court improperly instructed the jury that Electric Boat's alterations to the tools would bar the defendants' liability only if the defendants proved that the alterations had been the sole proximate cause of the plaintiffs' injuries and, furthermore, that the charge regarding alterations improperly shifted the burden of proving causation to the defendants;[18] and (2) there was insufficient evidence to support the jury's conclusion that the defendants' tools had reached the plaintiffs without a substantial change in condition. We agree that the trial court's instruction improperly shifted to the defendants the burden of proving causation.

The following additional facts are relevant to the resolution of this issue. Roger Mainville, Electric Boat's tool crib attendant responsible for tool repair and maintenance, testified that he followed a regular maintenance program that involved a daily inspection of tools.

[18] Specifically, the defendants argue, "under the trial court's sole proximate cause theory, there are no circumstances under which the alteration or modification of a product could prevent liability. As instructed by the court, in order for the plaintiffs to recover, the jury was required to find that the plaintiffs had proved, inter alia, that the defendants' tools were defective and that 'if there was a defect which made the tools unreasonably dangerous, that such defect was the proximate cause of the plaintiffs' injuries.' . . . If the jury found that the tools were defective and that such defect(s) were a proximate cause of the plaintiffs' injuries, the jury could not conclude that alteration or modification was the sole proximate cause of the plaintiffs' injuries even if they found that the tools were substantially altered or modified. Under the trial court's theory, therefore, the jury could return a plaintiffs' verdict even though the plaintiffs had failed to prove that the products had reached them without substantial change in their condition. On the other hand, a finding that any defect was not a proximate cause of the plaintiffs' injuries would necessitate a defendants' verdict, thereby eliminating the necessity of considering the issue of alteration or modification altogether."

Specifically, Mainville stated that he was responsible
for ensuring that the tools were properly oiled, that no
parts were loose, and that the tools were in correct
working order. If the tools were not in proper working
order, Mainville would not allow the workers to use
them in the shipyard. He testified that these tools were
used by Electric Boat employees for an average period
of two to three years before being discarded.

With respect to repairs, Mainville testified that 98
percent of the replacement parts purchased by Electric
Boat were bought directly from Chicago Pneumatic.
Rotor blades and ball bearings for the tools, however,
were purchased from outside vendors. Mainville stated
that these replacement parts bought from outside ven-
dors were of good quality and conformed to the defend-
ants' specifications. In fact, Stanley Works and Dresser
both purchased ball bearings from one of Electric Boat's
outside vendors. Furthermore, the defendants' agents
knew that Electric Boat repaired the tools with replace-
ment parts provided by outside vendors and even com-
plimented Mainville on Electric Boat's tool repair
operation.

Additionally, Mainville testified that Electric Boat
purchased chucks, which hold the grinding implement,
the burr, in place, from outside vendors. Mainville
stated that only quality chucks were installed in the
tools because imperfect chucks would cause the tool to
vibrate excessively. Occasionally, three and four piece
factory installed chucks would be replaced by two piece
chucks bought from outside vendors. The two piece
chuck installed by Electric Boat was found to be safer
by workers because it held the burr more securely.

There was also testimony, however, that in order to
make the tools more convenient for particular uses,
Electric Boat periodically removed certain safety fea-
tures, including wheel guards and throttle speed gover-

nors. John Strenkowski, a professor of mechanical aerospace engineering at North Carolina State University, testified on behalf of the defendants that the resulting reduction in mass from the absence of the wheel guards would cause increased vibration. Additionally, Electric Boat used six inch burr attachments on tools designed to use two inch burr attachments in order to reach compact areas. Strenkowski testified that the use of longer burr attachments also created the likelihood of increased vibration.

We begin with the defendants' claim with respect to the trial court's instruction regarding substantial alteration or modification.[19] The defendants argue that the trial court's instruction improperly shifted to them the burden of disproving an essential element of the plaintiffs' case. The defendants also claim that the trial court's instruction was incorrect as a matter of law because it stated that Electric Boat's alteration of the tools constituted a special defense to the plaintiffs' claims that would prevent liability *only if* the defendants proved that the alterations had been the sole proximate cause of the plaintiffs' injuries. Furthermore, they argue that the trial court's alteration or modification instruction improperly focused on causation, rather than on the significance of the product alteration. Although the defendants' claims can be viewed as distinct and separate, our consideration of one necessarily implicates the others and, consequently, we discuss the claims together. Although we agree that the trial court's instruction improperly shifted to the defendants the burden of disproving an element of the plaintiffs' case, we disagree that the use of the sole proximate cause standard was incorrect as a matter of law.

---

[19] We recognize that we generally begin our analysis with the sufficiency of the evidence claim because it may result in an outright reversal. Because we interpret General Statutes § 52-572p for the first time in this case, however, we first set forth the appropriate evidentiary standard.

We begin with General Statutes § 52-572p,[20] which governs allegations of alteration or modification. Section 52-572p provides that a manufacturer is not liable for harm that would not have occurred but for a third party's alteration or modification of the product in question. The defense, however, does not apply if the alteration or modification: (1) was in accordance with the manufacturer's instructions or specifications; (2) was made with the manufacturer's consent; or (3) was the result of conduct that the manufacturer reasonably should have anticipated. According to § 52-572p (b), "alteration or modification includes changes in the design, formula, function or use of the product from that originally designed, tested or intended by the product seller."

This court has previously considered the relationship between § 52-572p and the common-law requirement that a plaintiff must prove that the product arrived without a substantial change in condition. "Prior to the enactment of the [Product Liability Act (act); General Statutes § 52-572m et seq.], we adopted a cause of action in strict tort liability based on the Restatement (Second) of Torts § 402A. *Rossignol* v. *Danbury School of Aeronautics, Inc.*, [supra, 154 Conn. 559–60]. Section 402A shields defendants from liability for products altered or modified by providing that the product seller can be liable only when the seller's product 'was expected to

---

[20] General Statutes § 52-572p provides: "(a) A product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party unless: (1) The alteration or modification was in accordance with the instructions or specifications of the product seller; (2) the alteration or modification was made with the consent of the product seller; or (3) the alteration or modification was the result of conduct that reasonably should have been anticipated by the product seller.

"(b) For the purposes of this section, alteration or modification includes changes in the design, formula, function or use of the product from that originally designed, tested or intended by the product seller."

and did *reach the user or consumer without substantial change in the condition in which it was sold.'* . . . *Prokolkin* v. *General Motors Corp.*, 170 Conn. 289, 299, 365 A.2d 1180 (1976); *Rossignol* v. *Danbury School of Aeronautics, Inc.*, supra, 559. In other words, the defendant would be absolved of liability under § 402A if the plaintiff's injury was the result of an alteration or modification to the product made by a third party. See 2 Restatement (Second), [supra, § 402A, comment (g)]. 'In determining whether or not a statute abrogates or modifies a common-law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope.' *Willoughby* v. *New Haven*, 123 Conn. 446, 454, 197 A. 85 (1937)." (Emphasis in original.) *Elliot* v. *Sears, Roebuck & Co.*, 229 Conn. 500, 512–13, 642 A.2d 709 (1994). Accordingly, we read § 52-572p as being consistent with the common-law requirement that the plaintiff must prove that the product arrived without a substantial change in condition. In other words, § 52-572p is to be read not as an affirmative defense, but as a part of the plaintiff's prima facie case. We next decide how the subsequent alteration or modification of the product operates within the chain of causation.

Section 52-572p was enacted as part of the act, which, as this court has pointed out, was based on the Draft Uniform Product Liability Law (draft act); 44 Fed. Reg. 2996–3019 (1979); proposed by the United States Department of Commerce. *Elliot* v. *Sears, Roebuck & Co.*, supra, 229 Conn. 505. Because § 52-572p adopted the language of § 110 of the draft act nearly verbatim,[21]

---

[21] "Section 110 of the draft act provides: '(a) A product seller shall not be liable for harm that would not have occurred but for the fact that his product was altered or modified by a third party unless: (1) The alteration or modification was in accordance with the product seller's instructions or specifications; (2) The alteration or modification was made with the *express* consent of the product seller; or (3) The alteration or modification was the

we look to the commentary to the draft act for guidance. See *Maloney* v. *Pac*, 183 Conn. 313, 326–27, 439 A.2d 349 (1981).

The commentary provides that "[t]his section deals with the situation where a third party—one other than the product seller or the claimant—has altered or modified the product and this has led to [the] claimant's harm. A few courts have imposed liability on the product seller in this situation provided that the third party's conduct was in some manner 'foreseeable.' . . . Decisions that hold the original product seller responsible in these instances border on absolute liability. Thus, insurers appear to have a just concern about broad-scale imposition of liability where third party intervention has been the principal cause of the accident." (Citation omitted.) 44 Fed. Reg. 3010 (1979).

The commentary, however, makes it clear that the section's liability limitation is narrow. "Section 110 takes account of the hardship that can result from an overly broad liability limitation on product modification or alteration; the provision is very narrowly drawn. First, a product seller may avoid liability for a defective product *only* where the harm would not have occurred 'but for' the alteration or modification. In contrast, the 'Restatement' and the recently enacted state statutes cited above would shield the manufacturer whenever the third party's conduct was a 'substantial cause.' A rule of this type, however, invites litigation over what is 'substantial,' and also may diminish a product seller's

result of conduct that reasonably should have been anticipated by the product seller. (b) For the purposes of this section, alteration or modification includes changes in the design, formula, function or use of the product from that originally designed, tested or intended by the product seller. *It includes failure to observe routine care and maintenance, but does not include ordinary wear and tear.'* . . . 44 Fed. Reg. 3000 [1979]. Except for the omission of the emphasized language, General Statutes § 52-572p is identical to § 110." (Emphasis in original.) *Elliot* v. *Sears, Roebuck & Co.*, supra, 229 Conn. 510 n.12.

responsibility for otherwise culpable conduct. Cases in accord with the approach taken in Section 110 include *Temple* v. *Wean United, Inc.*, 50 Ohio St. 2d 317, 362 N.E.2d 267 (1977); *Santiago* v. *Package Machinery Co.*, 123 Ill. App. 2d 305, 260 N.E.2d 89 [1970]; *St. Pierre* v. *Gabel*, 351 So. 2d 821 (La. App. 1977)." (Emphasis in original; internal quotation marks omitted.) 44 Fed. Reg. 3010–11 (1979).

Our research reveals that Connecticut's alteration or modification defense statute, § 52-572p, is the only statute based on the language of the draft act. Although other statutes provide a defense if an alteration or modification was a proximate cause[22] or a substantial cause,[23] § 52-572p is the only statute framed in "but for" language. We recognize that we have previously stated that this language, known as "causation in fact," does not necessarily mean the sole cause of the resulting harm because there may indeed be several causes in fact. See *Doe* v. *Manheimer*, 212 Conn. 748, 757, 563 A.2d 699 (1989) ("[t]he proximate cause requirement tempers the expansive view of causation [in fact]" [internal quotation marks omitted]). "The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct." Id.

Notwithstanding this court's prior pronouncements with respect to causation in fact, the commentary to § 110 of the draft act clarifies that, in using the "but for" language, the section limits a manufacturer's liability if a subsequent alteration or modification was solely responsible for the resulting harm. See 44 Fed. Reg. 3011 (1979). Indeed, the cases to which the commentary

---

[22] See, e.g., Ariz. Rev. Stat. Ann. § 12-683 (2) (West 1992); Idaho Code § 6-1405 (4) (b) (1990); Ind. Code Ann. § 33-1.1.5-4 (b) (3) (Michie Sup. 1996); N.C. Gen. Stat. § 99B-3 (a) (1995); S.D. Codified Laws § 20-9-10 (Michie 1995).

[23] See, e.g., Ky. Rev. Stat. Ann. § 411.320 (2) (Banks-Baldwin 1992); N.D. Cent. Code § 28-01.3-03 (Sup. 1995); Or. Rev. Stat. § 30.915 (2) (1988); R.I. Gen. Laws § 9-1-32 (b) (1985).

cites as supportive of its approach limit a manufacturer's liability if the subsequent alteration or modification was the sole proximate cause or a superseding cause leading to the plaintiff's injury. See *Santiago* v. *Package Machinery Co.*, supra, 123 Ill. App. 2d 312 (considering whether "*sole* proximate cause of the injury was the conduct of another" [emphasis in original]); *St. Pierre* v. *Gabel*, supra, 351 So. 2d 824 ("a manufacturer cannot be held liable for injuries caused by a defective product where the defect was created by an alteration which amounts to an intervening or superseding cause"); *Temple* v. *Wean United, Inc.*, supra, 50 Ohio St. 2d 327 (focusing on whether alteration constituted "sole responsible cause" of plaintiff's injury). This type of analysis is consistent with Connecticut case law with respect to intervening causation. For instance, in *D'Arcy* v. *Shugrue*, 5 Conn. App. 12, 24–25, 496 A.2d 967, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985), the Appellate Court stated in the context of a negligence action: "If the third person's negligence is determined to be a superseding cause of the plaintiff's injury, that negligence, rather than the negligence of the party attempting to invoke the doctrine of superseding cause, is said to be the sole proximate cause of the injury. *Virelli* v. *Benhattie, Inc.*, 146 Conn. 203, 209, 148 A.2d 760 (1959); see also *Miranti* v. *Brookside Shopping Center, Inc.*, 159 Conn. 24, 29, 266 A.2d 370 (1969); *Corey* v. *Phillips*, [126 Conn. 246, 254–56, 10 A.2d 370 (1939)]."

Thus, a manufacturer's liability is limited only if the subsequent alteration or modification breaks the chain of causation, akin to an intervening superseding cause in negligence law. *Southwire Co.* v. *Beloit Eastern Corp.*, 370 F. Sup. 842, 857 n.21 (E.D. Pa. 1974). In other words, a manufacturer "could still be liable because the original defect, although not the sole cause of the accident, would constitute a contributing or concurrent

proximate cause in conjunction with the subsequent alteration." *Soler* v. *Castmaster, Division of H.P.M. Corp.*, 98 N.J. 137, 150, 484 A.2d 1225 (1984). In our view, this construction is consistent with the draft act's intent that "the provision is very narrowly drawn." 44 Fed. Reg. 3010–11 (1979).[24] Accordingly, § 52-572p acts to limit a manufacturer's liability if the alteration or modification was the sole proximate cause of a plaintiff's injury.[25]

Furthermore, our conclusion is consistent with the policy rationales supporting the imposition of strict products liability. The justification for strict liability is "[1] that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; [2] that the public has the right to and does expect, in the case of products

[24] Indeed, we note that our resolution of this issue is consistent with the position adopted in the Uniform Model Products Liability Act (model act), which was promulgated following public comment on the draft act. See 44 Fed. Reg. 62,714 (1979) ("[t]he written commentary received by [the Department of] Commerce regarding the Draft Law totals approximately 1500 pages, representing 240 separate communications"). Section 112 (D) (2) of the model act provides in relevant part: "When the product seller proves, by a preponderance of the evidence, that an alteration or modification of the product by the claimant, or by a party other than the claimant or the product seller, has caused the claimant's harm, the claimant's damages shall be subject to reduction or apportionment to the extent that the alteration or modification was a cause of the harm. Under this Subsection, the trier of fact may determine that the harm arose solely because of the product alteration or modification." Id., 62,737. The commentary to the model act clarifies that "[i]f the harm *arose solely* because of the product alteration or modification, the product seller will not be liable at all." (Emphasis added.) Id., 62,739.

[25] We point out that a jury's determination that a subsequent alteration or modification constituted the sole proximate cause of a plaintiff's harm is not the end of the inquiry. Section 52-572p (a) provides that a manufacturer may still be strictly liable if the alteration or modification: (1) was in accordance with the manufacturer's instructions or specifications; (2) was made with the manufacturer's consent; or (3) was the result of conduct that the manufacturer reasonably should have anticipated.

which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; [3] that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and [4] that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford protection are those who market the products." 2 Restatement (Second), supra, § 402A, comment (c). In our view, these policy rationales would be undermined if a manufacturer were able to escape liability because a subsequent alteration or modification was a concurrent cause, together with the original defect, resulting in the plaintiff's injury. As one commentator has stated, "[t]o allow any alteration less than the sole cause of the harm to supersede the manufacturer's liability is incongruous with the purpose of strict liability. A manufacturer should not escape responsibility for an accident-causing defect—no matter how small a role it played in the actual injury—simply because some alteration was a contributing factor. If a causal connection exists between the injury and a defect present when the product left the manufacturer's hands, [the manufacturer] should be liable." Comment, "Substantial Change: Alteration of a Product as a Bar to a Manufacturer's Strict Liability," 80 Dick. L. Rev. 245, 252–53 (1976).

Because this court previously has not had the opportunity to address the evidentiary framework established by § 52-572p, we now set forth the respective parties' appropriate burdens of proof.[26] We begin by recognizing

---

[26] "The phrase 'burden of proof' is used in two ways. First, to refer to the burden of persuading the jury that a fact exists, and second, to refer to the burden of producing sufficient evidence to persuade the judge to allow the case or issue to go to the jury, viz., that a prima facie case exists. *Sortito* v. *Prudential Ins. Co.*, 108 Conn. 163, 171, 142 A. 808 (1928); *Baxter* v.

that, as part of its prima facie case, the plaintiff must establish that the product in question was intended to and did reach the ultimate consumer without substantial change in condition. *Rossignol* v. *Danbury School of Aeronautics, Inc.*, supra, 154 Conn. 559–60; see also *Guglielmo* v. *Klausner Supply Co.*, 158 Conn. 308, 315–16, 259 A.2d 608 (1969) (plaintiff must allege and prove product was expected to and did reach user without substantial change in condition).[27] It is then incumbent upon the defendant to assert the alteration or modification defense. Under § 52-572p (a), the defendant bears the burden of producing evidence of a substantial change—that is, specifying a modification or alteration that was the sole proximate cause, and not merely a substantial contributing factor, of the plaintiff's harm. See 44 Fed. Reg. 3011 (1979). If this defense is invoked, then the plaintiff must disprove the alleged substantial change. *Southwire Co.* v. *Beloit Eastern Corp.*, supra, 370 F. Sup. 857. The plaintiff, however, need not rebut every possible alteration or modification, but only those that the defendant has produced. See *Berry* v. *Gibson*,

---

*Camp*, 71 Conn. 245, 252–53, 41 A. 803 (1898). The burden of persuasion creates a risk of an adverse decision on the merits by the jury, whereas the burden of going forward or producing evidence creates a risk that the judge will withdraw the case or an issue from the jury." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 4.1.1.

[27] We note that a plaintiff may establish that the product in question was intended to and did reach the consumer without substantial change in condition merely by making such an allegation in the plaintiff's complaint and by adducing sufficient evidence to warrant the inference that the product did, in fact, reach the consumer without substantial change in condition. See, e.g., *Prokolkin* v. *General Motors Corp.*, supra, 170 Conn. 299–300; *Wachtel* v. *Rosol*, supra, 159 Conn. 501; *Coe-Park Donuts, Inc.* v. *Robertshaw Controls Co.*, 1 Conn. App. 84, 89, 468 A.2d 292 (1983). Where, however, the plaintiff is aware that there has been a substantial change to the product, the plaintiff should acknowledge the change in its complaint, but allege that it was not the sole proximate cause of the plaintiff's injury or, alternatively, that the change: (1) was made in accordance with the manufacturer's instructions or specifications; (2) was made with the manufacturer's consent; or (3) was the result of conduct that the manufacturer reasonably should have anticipated. See General Statutes § 52-572p.

141 Ill. App. 3d 876, 881, 491 N.E.2d 33 (1986). In order to rebut the defendant's allegations of substantial change, the plaintiff must prove that the harm would have occurred notwithstanding the alteration or modification. See *Kuhnke* v. *Textron, Inc.*, 140 Ariz. 587, 590, 684 P.2d 159 (1984). Alternatively, the plaintiff must establish that the alteration or modification: (1) was in accordance with the manufacturer's instructions or specifications; (2) was made with the manufacturer's consent; or (3) was the result of conduct that the manufacturer reasonably should have anticipated. General Statutes § 52-572p (a). At all times, however, the ultimate burden of persuasion (or, put another way, the risk of nonpersuasion) that the product reached the ultimate consumer without substantial change remains with the plaintiff. *C & S Fuel, Inc.* v. *Clark Equipment Co.*, 552 F. Sup. 340, 345–46 (E.D. Ky. 1982); *Southwire Co.* v. *Beloit Eastern Corp.*, supra, 857–58.

This construction of the parties' respective burdens of proof is consistent with the policies underlying strict products liability. As the court in *Southwire Co.* stated: "While § 402A is meant to require manufacturers and sellers to bear much of the responsibility and cost of injuries to consumers resulting from their defective products, it is not meant to impose upon each manufacturer and seller an absolute liability as insurer for all injuries to consumers, regardless of the relation of plaintiff's injuries to the particular defendant's product." *Southwire Co.* v. *Beloit Eastern Corp.*, supra, 370 F. Sup. 858.

Furthermore, we note that the burden-shifting analysis we set forth today has been adopted by the majority of courts that have considered the allocation of burden of proof in cases involving the alteration or modification defense. See, e.g., *Page* v. *Barko Hydraulics*, 673 F.2d 134, 138 (5th Cir. 1982); *C & S Fuel, Inc.* v. *Clark Equip-*

*ment Co.*, supra, 552 F. Sup. 345–46; *Southwire Co.* v. *Beloit Eastern Corp.*, supra, 370 F. Sup. 857–58; *Kuhnke* v. *Textron, Inc.*, supra, 140 Ariz. 590; *Navarro* v. *George Koch & Sons, Inc.*, 211 N.J. Super. 558, 572–74, 512 A.2d 507, cert. denied, 107 N.J. 48, 526 A.2d 138 (1986); *Seeborg* v. *General Motors Corp.*, 284 Or. 695, 700–701, 588 P.2d 1100 (1978); see also 3 American Law of Products Liability (3d. Ed. 1987) § 43:14.[28] In our view, this evidentiary framework best comports with our common-law requirement that the plaintiff bears the burden of proving that the product reached the ultimate consumer without substantial modification. This framework also recognizes that the alteration or modification defense in § 52-572p is narrowly drawn—the manufacturer must produce evidence that the plaintiff's harm occurred solely due to the third party's alteration or modification.

Mindful of these principles, we turn to the trial court's instruction with respect to § 52-572p.[29] "In assessing the

---

[28] A minority of courts have concluded that substantial change is an affirmative defense that the defendant has the burden of proving. See *Cornette* v. *Searjeant Metal Products, Inc.*, 147 Ind. App. 46, 67, 258 N.E.2d 652 (1970) (Sharp, J., concurring); *Placencio* v. *Allied Industrial International, Inc.*, 724 S.W.2d 20, 22 (Tex. 1987).

[29] The trial court instructed the jury as follows: "Now, another area I have to discuss with you is the claim of the defendants that the tools were altered or modified, and, again, that's something that is a defense if they were modified in a way not approved of or not anticipated by the defendants; and let me give you the rule in that regard. The alteration or modification of a product by a third party, not the plaintiff, but someone other than the plaintiff—in this case, the Electric Boat—is a complete defense to a product liability claim if you find the following: One, the alleged injuries would not have occurred but for the alteration or modification; and two, if the alteration or modification was unintended and unforeseeable by the manufacturer. The law provides that the defendants are not liable for harm that occurred due to the fact that the product was altered or modified by a third party except under circumstances where, one, the alteration or modification was in accordance with the instructions or specifications of the product seller; two, the alteration or modification was made with the consent of the product seller; three, the alteration or modification was the result of conduct that reasonably should have been anticipated by the product seller. In regard to this issue, you may consider whether or not the conduct of the owner of

adequacy of a charge to the jury, we consider the charge in its entirety, and judge it by its total effect rather than by its individual component parts. *Van Steensburg* v. *Lawrence & Memorial Hospitals*, 194 Conn. 500, 507, 481 A.2d 750 (1984). We consider whether the instruc-

the tools, Electric Boat, by its maintenance procedures and its practice of repairing tools and use of replacement parts, constitutes an alteration or modification of the tools.

"If you find that Electric Boat did alter or modify the tools in a manner which was neither intended nor anticipated by the defendants, and that the alteration was the cause of the plaintiffs' injuries, then the defendants are not liable and your verdict must be for the defendants. On the other hand, if you find that Electric Boat did not alter or modify the tools, or if they did and such alteration was not the cause of the plaintiffs' injuries, then you must [find] in favor of the plaintiffs in regard to this issue. Again, with respect to actions of Electric Boat in altering or modifying the tools, their actions must be the sole proximate cause of the plaintiffs' injuries and the defendants—if the defendants' product is modified or altered by a third party other than the plaintiff—[are] not liable for injuries which were solely caused by the fact that the product was altered or modified.

"Under the law, the allegation of misuse applies to modification or alteration of the product by a third party, it does not apply to the conduct of the plaintiff. It also only relieves the product seller of liability if the alteration or modification by the third party is the sole proximate cause of the injuries to the plaintiffs. In order for the defendant to prove that a third party was solely responsible for the injury to the plaintiff, they must prove that any modifications or alterations were made in violation of the instructions or specifications of the seller and without the consent of the seller. They must also show that the alteration or modification of the product was not reasonably foreseeable by the seller. In other words, the defendants in this case can only be absolved from liability using a defense of alteration or modification by Electric Boat if, first, Electric Boat changed the tools without the consent of the defendants and in situations that were neither intended nor foreseeable by the defendants; and, second, if the harm suffered by the plaintiffs would not have occurred but for the modifications or alterations. You will thus need to consider whether there were any modifications or alterations made to the tools, and if so, whether the injuries to the plaintiffs were caused solely by any modifications or alterations, or whether the injuries would have occurred independent of any modifications or alterations. You must also consider the intended and anticipated and expected use of the tools in order to determine whether any modification or alterations were foreseeable. If the seller could have anticipated the modifications or alterations, then their failure to warn against that type of alteration or modification renders the tool defective. The general warnings against alterations or modifications is not sufficient."

tions are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury. *Hall* v. *Burns*, 213 Conn. 446, 482, 569 A.2d 10 (1990); *Grecki* v. *New Britain*, 174 Conn. 200, 203, 384 A.2d 372 (1978); *Mack* v. *Perzanowski*, 172 Conn. 310, 313, 374 A.2d 236 (1977); *Nally* v. *Charbonneau*, 169 Conn. 50, 55–56, 362 A.2d 494 (1975). The charge must give the jurors a clear comprehension of the issues presented for their determination under the pleadings and upon the evidence, and must be suited to guide them in the determination of those issues. *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 566, 562 A.2d 1100 (1989); *Nally* v. *Charbonneau*, supra [55–56]. The test is whether the charge as a whole fairly presented the case to the jury so that no injustice was done under established rules of law. *Hall* v. *Burns*, supra [482]; *Van Steensburg* v. *Lawrence & Memorial Hospitals*, supra [507]." *Goodmaster* v. *Houser*, 225 Conn. 637, 644–45, 625 A.2d 1366 (1993).

In the present case, the trial court correctly stated that the plaintiffs were required to prove that the defendants' tools reached the plaintiffs without a substantial change. Moreover, the trial court correctly stated that Electric Boat's actions in altering or modifying the tools must have been the sole proximate cause of the plaintiffs' injuries. The entire alteration or modification defense instruction, however, was given in the context of the defendants' special defenses. In fact, the trial court prefaced the instruction by stating that "the defendants must prove certain affirmative defenses which they've made." Indeed, the special interrogatory form that the trial court submitted to the jury provided that, with respect to the alteration or modification defense, "[t]he defendants have the duty to prove the allegations of the special defense."[30]

---

[30] The special interrogatory form provided in relevant part: "If the jury has answered 'Yes' to any one or more of the first four questions, you must

Furthermore, with respect to the three exceptions delineated in § 52-572p, the trial court clearly placed the burden of persuasion on the defendants. Specifically, the trial court required the defendants to prove that Electric Boat's alterations or modifications: (1) were in violation of the defendants' instructions or specifications; (2) were made without the defendants' consent; or (3) were not reasonably foreseeable by the defendants. In other words, the trial court diminished the plaintiffs' burden of proof by instructing the jury that the defendants were required to disprove elements that the plaintiffs rightfully should have proven.

"An improper instruction on the burden of proof may so mislead the jury as to be potentially harmful to one of the parties and therefore may amount to reversible error. See *Alaimo* v. *Royer*, 188 Conn. 36, 40, 448 A.2d 207 (1982); *Potts* v. *Buckley*, 97 Conn. 174, 178, 115 A. 726 (1922); see also *LeCount* v. *Farrand*, 118 Conn. 210, 213, 171 A.2d 623 (1934)." *Goodmaster* v. *Houser*, supra, 225 Conn. 645. In the present case, the trial court imposed a more rigorous standard of proof on the defendants than is required by law and, therefore,

now consider the special defenses raised by the defendants. The defendants have the duty to prove the allegations of the special defenses.

"B. The defendants have claimed, by way of special defense, that the plaintiffs' injuries and damages were caused by their employer, Electric Boat. If you find that the special defense against Electric Boat was proven by the defendants as the *sole proximate cause* of the plaintiffs' injuries and damages your verdict must be for the defendants.

"Please indicate whether the special defense listed below was the *sole proximate cause* of the plaintiffs' injuries.

"1. The defendants claim that the plaintiffs' injuries were caused by the intervening negligence of Electric Boat since they owned and maintained the tools, and supervised and controlled the working conditions of the plaintiffs. Do you find that the defendants have proven this special defense?
                           Yes ___ No _X_

"If your answer is 'Yes' to the above question your verdict must be for the defendants and you need not answer any further questions. If your answer is 'No,' proceed to the next series of questions under C." (Emphasis in original.)

potentially prejudiced their defense to the design defect claim. See id., 647 (concluding that trial court imposed more rigorous standard on plaintiff in proving damages, and potentially prejudiced plaintiff's right to recover lawful damages); cf. *Alaimo* v. *Royer*, supra, 39–40 (ordering new trial because trial court failed to instruct jury that heightened burden of proof applied in fraud actions). In other words, the jury charge was potentially prejudicial to the defendants because the plaintiffs may not have been able to prove, by a preponderance of the evidence, that the plaintiffs' injuries would have occurred notwithstanding the subsequent alterations or modifications, or that the alterations or modifications: (1) were in compliance with the defendants' instructions or specifications; (2) were made with the defendants' consent; or (3) were reasonably foreseeable by the defendants. Because we conclude that the trial court's instruction relating to the parties' respective burdens of proof under § 52-572p constituted harmful error, we reverse the judgment of the trial court.[31]

---

[31] Although we generally evaluate the sufficiency of the evidence claim first because, were the defendants to prevail on that claim, the plaintiffs would not be entitled to a new trial; see C. Tait, Connecticut Appellate Practice and Procedure (2d Ed. 1993) § 7.18 (a); we need not do so in this case. In light of the evidentiary framework for assessing a claim of alteration/modification defense that we have set forth today, we conclude that the jury reached its verdict based on an improper instruction concerning the parties' respective burdens of proof. Consequently, although the standard governing our review of sufficiency of the evidence is to evaluate the evidence construing it in the light most favorable to sustaining the facts expressly and impliedly found by the jury; *State* v. *Joyner*, 225 Conn. 450, 455, 625 A.2d 791 (1993); we cannot presume the sufficiency of the evidence on which the jury based its verdict in light of the improper instruction. Accordingly, we need not reach the defendants' argument that there was insufficient evidence to support the conclusion that the tools reached the plaintiffs without substantial change in condition.

Furthermore, in light of our reversal of the judgment on the basis of the trial court's alteration/modification instruction, we also need not reach the defendants' claims with respect to the special interrogatories and accompanying jury instructions, as well as the subsequent instructions when the case was submitted to the jury for reconsideration after the initial verdict.

## III

Although we have concluded that a new trial is necessary, we address the defendants' final claim because it is likely to arise on retrial.The defendants argue that the trial court improperly instructed the jury that the "state-of-the-art defense" was restricted to the plaintiffs' failure to warn claim.[32] Specifically, the defendants assert that the trial court improperly prevented the jury from considering the state-of-the-art defense in the context of the plaintiffs' claim of defective design. In response, the plaintiffs argue that the state-of-the-art defense has no place in a strict products liability action because it improperly diverts the jury's attention from the product's condition to the manufacturer's conduct. The plaintiffs further assert that even if the trial court improperly declined to provide the instruction with respect to the design defect claim, the defendants have failed to prove that it constituted harmful error. Although we agree with the defendants that state-of-the-art evidence applies to design defect claims as well as to failure to warn claims, we disagree that such evidence constitutes an affirmative defense to the plaintiffs' design defect claims.

The following additional facts are relevant to this issue. The defendants presented testimony that they produced the safest and highest quality tools that they were able to design. Robert Marelli, superintendent of tools and equipment at Electric Boat, testified that the defendants' tools were the best for Electric Boat's purposes and that Electric Boat would be in a "tough situation" if faced with the prospect of having to replace them.

---

[32] The defendants and the trial court both use the term "state-of-the-art defense." Although we conclude later in this opinion that this term is a misnomer and that the preferable term is "state-of-the-art evidence," we use state-of-the-art defense for the purpose of characterizing the trial court's instruction and the defendants' argument on appeal.

Conversely, the plaintiffs presented evidence that a chipping hammer manufactured by Atlas Copco, which had a reduced vibration design, was available in 1976. A Chicago Pneumatic interoffice memorandum dated October, 1974, provided that, "[u]nless we at least keep pace with the technological developments of major competitors like Atlas Copco, we certainly face a prospect of loss of market share." The plaintiffs also presented another Chicago Pneumatic interoffice memorandum dated May, 1974, which outlined various devices designed to isolate vibration developed by Chicago Pneumatic in conjunction with Caterpillar Tractor Company.

The trial court instructed the jury that "state of the art is defined as the level of scientific and technological knowledge existing at the time the product in question was designed for manufacture."[33] The court also instructed the jury that a manufacturer cannot be held to standards that exceed the limit of scientific advances

---

[33] The trial court's instruction with respect to state-of-the-art evidence provided: "Also, the defendants must prove certain affirmative defenses which they've made. The first of these is what's called state of the art. Now, basically, state of the art is defined as the level of scientific and technological knowledge existing at the time the product in question was designed for manufacture. In designing or producing a product, a manufacturer cannot be held to standards which exceed the limit of scientific [advances] and technology that exist at the time of manufacture. A manufacturer cannot be charged with the duty to incorporate technology that was not available at the time that it manufactured its product. State-of-the-art evidence is based on technology that existed at the time the product was placed on the market rather than at the time of the injury or at the time of trial. *State of the art is a valid defense to claims based on failure to warn. In this regard, the state-of-the-art defense applies only to the [plaintiffs'] claims of failure to warn, not to anything else; so the law does not impose an obligation on the defendant to warn users of unknown risks.*

"If you find the defendants' tools were manufactured in accordance with the state of the art, then the tools are not defective due to lack of warning and you must find for the defendants on that claim. On the other hand, if you find that they had knowledge of problems and failed to use that knowledge, then they may be held liable with respect to the claim of failure to warn." (Emphasis added.)

and technology existing at the time of manufacture and, therefore, the defendants could not be found liable if they had proven compliance with the state of the art. The trial court, however, limited the applicability of the state-of-the-art defense solely to the plaintiffs' failure to warn claims. The defendants took timely exception to the court's limitation of the state-of-the-art defense to only the failure to warn claims.

In *Tomer* v. *American Home Products Corp.*, 170 Conn. 681, 687, 368 A.2d 35 (1976), this court recognized the applicability of state-of-the-art evidence to failure to warn claims, stating that "[s]ince the defendants could not be held to standards which exceeded the limits of scientific advances existing at the time of their allegedly tortious conduct, expert testimony tending to show the scope of duties owed could have been properly limited to scientific knowledge existing at that time." The question of whether state-of-the-art evidence similarly applies to design defect claims, however, is a matter of first impression for this court.[34]

We begin our analysis of this issue by recognizing that the term "state of the art" has been the source

[34] We note that, subsequent to our decision in *Tomer* v. *American Home Products Corp.*, supra, 170 Conn. 681, the legislature recognized the applicability of state-of-the-art evidence to failure to warn claims. See General Statutes § 52-572q (b) (trier of fact may consider, among other factors, "the technological feasibility and cost of warnings and instructions"). We further note that, although the legislature rejected language that would have created an absolute defense for a manufacturer's compliance with the state of the art; see 21 S. Proc., Pt. 7, 1978 Sess., pp. 2685, 2696; nothing in the act or in its legislative history discusses whether such evidence may be a factor for the trier of fact to consider in determining the adequacy of a product design. In the absence of any language in the act inconsistent with the admissibility of state-of-the-art evidence in design defect claims, we do not construe the act's silence to preclude consideration of the relevance of such evidence. See *LaMontagne* v. *E.I. du Pont de Nemours & Co.*, 41 F.3d 846, 856 (2d Cir. 1994) (because act does not delineate elements of claims that it consolidates, common law provides basis for theories of recovery); cf. *Kyrtatas* v. *Stop & Shop, Inc.*, 205 Conn. 694, 699, 535 A.2d 357 (1988) (concluding that common-law doctrine of indemnification is inconsistent

of substantial confusion. See J. Beasley, supra, p. 393 ("[t]he status of 'the state of the art' in strict tort liability actions and the treatment and weight accorded evidence of the state of the art have been obscured by a lack of precision in definition and function"); G. Robb, "A Practical Approach to Use of State of the Art Evidence in Strict Products Liability Cases," 77 Nw. U. L. Rev. 1, 3 (1982) ("[m]uch of the confusion in the use of 'state of the art' evidence can be attributed to the uncertain meaning of the term"). Several courts have defined state-of-the-art evidence in terms of industry custom; see, e.g., *Smith* v. *Minster Machine Co.*, 669 F.2d 628, 633 (10th Cir. 1982) (viewing proper meaning of "state of the art . . . to mean simply the custom and practice in an industry"); *Sturm, Ruger & Co.* v. *Day,* 594 P.2d 38, 44 (Alaska 1979), cert. denied, 454 U.S. 894, 102 S. Ct. 391, 70 L. Ed. 2d 209 (1981) ("[g]enerally speaking, 'state of the art' refers to customary practice in the industry"); *Suter* v. *San Angelo Foundry & Machine Co.*, 81 N.J. 150, 172, 406 A.2d 140 (1979) (state of the art includes common practice and industry standards); or in terms of compliance with then existing statutes or governmental regulations. See, e.g., *Frazier* v. *Kysor Industrial Corp.*, 43 Colo. App. 287, 293, 607 P.2d 1296 (1979) (noting absence of statutes or regulations to determine state of the art); *Rucker* v. *Norfolk & Western Railway Co.*, 64 Ill. App. 3d 770, 781–82, 381 N.E.2d 715 (1978) (characterizing evidence of compliance with federally mandated design specifications as state-of-the-art defense), rev'd on other grounds, 77 Ill. 2d 434, 396 N.E.2d 534 (1979).

with act's provisions concerning comparative responsibility, award of damages and contribution). Indeed, the legislature made it clear that, although the act was intended to abolish various common-law causes of action and to consolidate them into one statutory claim, it was not intended to abolish all common-law considerations. See 22 S. Proc., Pt. 14, 1979 Sess., p. 4639; see also *LaMontagne* v. *E.I. du Pont de Nemours & Co.*, supra, 855–56.

The majority of courts, however, have defined state-of-the-art evidence as the level of relevant scientific, technological and safety knowledge existing and reasonably feasible at the time of design. See, e.g., *Carter v. Massey-Ferguson, Inc.*, 716 F.2d 344, 347 (5th Cir. 1983) (" 'state of the art' refers to the technological environment, that is, what *can* be done" [emphasis in original]); *Gosewisch v. American Honda Motor Co.*, 153 Ariz. 389, 394, 737 P.2d 365 (App. 1985) ("state of the art refers to what feasibly could have been done"); *Montgomery Ward & Co. v. Gregg*, 554 N.E.2d 1145, 1155–56 (Ind. App. 1990) (defining state of the art as technological advancement, not as industry custom or practice); *Chown v. USM Corp.*, 297 N.W.2d 218, 222 (Iowa 1980) (defining state of the art as technological and practical feasibility); *O'Brien v. Muskin Corp.*, 94 N.J. 169, 182, 463 A.2d 298 (1983) (defining state of the art as "existing level of technological expertise and scientific knowledge relevant to a particular industry at the time a product is designed"); *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 748 (Tex. 1980) ("[state of the art] includes the scientific knowledge, economic feasibility, and the practicalities of implementation when the product was manufactured"); see also 2 American Law of Products Liability (3d Ed. 1996) § 30:50, p. 30-77 (" '[s]tate of the art' has been defined as the safety, technical, mechanical, and scientific knowledge in existence and reasonably feasible for use at the time of manufacture").

We also recognize that courts are divided on the issue of whether state-of-the-art evidence is admissible in design defect claims. Several courts have concluded that such evidence is inadmissible in design defect claims because it improperly focuses on the reasonableness of the manufacturer's conduct, which is irrelevant in a strict products liability action. See, e.g., *Habecker v. Clark Equipment Co.*, 36 F.3d 278, 285–86 (3d Cir.

1994), cert. denied, 514 U.S. 1003, 115 S. Ct. 1313, 131 L. Ed. 2d 195 (1995) (applying Pennsylvania law, characterizing state-of-the-art evidence as "absolutely irrelevant" in strict liability action); *Johnson* v. *Raybestos-Manhattan, Inc.*, 69 Haw. 287, 288–89, 740 P.2d 548 (1987) ("[a]lthough highly relevant to a *negligence* action, [state-of-the-art evidence] has absolutely no bearing on the elements of a strict products liability claim" [emphasis in original]); *Elmore* v. *Owens-Illinois, Inc.*, 673 S.W.2d 434, 438 (Mo. 1984) ("[t]he manufacturer's standard of care is irrelevant because it relates to the reasonableness of the manufacturer's design choice; fault is an irrelevant consideration on the issue of liability in the strict liability context"). Conversely, other courts, in construing relevant state tort reform statutes, have stated that a manufacturer's proof of state-of-the-art evidence constitutes a complete defense to a design defect claim. See, e.g., *Montgomery Ward & Co.* v. *Gregg*, supra, 554 N.E.2d 1155 (defining parameters of state of the art for purposes of affirmative defense statute); *Hughes* v. *Massey-Ferguson, Inc.*, 522 N.W.2d 294, 295–96 (Iowa 1994) (setting forth quantum of state-of-the-art evidence necessary for defendant to avoid liability); *Roberts* v. *Rich Foods, Inc.*, 139 N.J. 365, 377–78, 654 A.2d 1365 (1995) (stating defendant must establish state-of-the-art evidence by preponderance of evidence in order to prevail).

Nevertheless, the overwhelming majority of courts have held that, in design defect cases, state-of-the-art evidence is relevant to determining the adequacy of the product's design. See, e.g., *Robinson* v. *Audi NSU Auto Union*, 739 F.2d 1481, 1485–86 (10th Cir. 1984) ("[j]ust as [the] plaintiff could use state-of-the-art evidence to try to show the feasibility of other safer alternatives, [the] defendant could use state-of-the-art evidence to attempt to establish the expectations of a reasonable consumer"); *Reed* v. *Tiffin Motor Homes, Inc.*, supra,

697 F.2d 1197 ("admission of state of the art evidence, while only a factor to consider, is both necessary and probative on the issue of 'unreasonably dangerous'"); *Fibreboard Corp.* v. *Fenton*, 845 P.2d 1168, 1174 (Colo. 1993) ("[s]tate-of-the-art evidence is clearly admissible and is a factor to consider in determining whether a product is defective and unreasonably dangerous due to a defective design"); *Johnson* v. *Salem Corp.*, 97 N.J. 78, 88, 477 A.2d 1246 (1984) ("[s]tate-of-the-art is a relevant factor in considering the adequacy of the design of the product under the risk-utility analysis, including particularly design features relating to safety"); *Lancaster Silo & Block Co.* v. *Northern Propane Gas Co.*, 75 App. Div. 2d 55, 66, 427 N.Y.S.2d 1009 (1980) (concluding that state-of-the-art evidence is relevant because "state of the art sets the parameters of feasibility"); *Boatland of Houston, Inc.* v. *Bailey*, supra, 609 S.W.2d 748 (finding state-of-the-art evidence "is important in determining whether a safer design was feasible"); *Crittenden* v. *Fibreboard Corp.*, 58 Wash. App. 649, 658–59, 794 P.2d 554 (1990) (concluding state-of-the-art evidence is admissible in either risk-utility or consumer expectation analysis); see also 2 American Law of Products Liability, supra, § 30:50, p. 30-79 ("[t]he majority of courts have found . . . that in design defect cases, state of the art evidence is relevant to show the reasonableness of the design or the fact that the product was dangerous beyond the expectations of the ordinary consumer").

The plaintiffs assert that state-of-the-art evidence has no place in a strict products liability action because it improperly focuses the jury's attention on the manufacturer's conduct. We disagree. We adopt the majority view and hold that such evidence is relevant and assists the jury in determining whether a product is defective and unreasonably dangerous. See *Reed* v. *Tiffin Motor Homes, Inc.*, supra, 697 F.2d 1197 ("admission of state

of the art evidence, while only a factor to consider, is both necessary and probative on the issue of 'unreasonably dangerous' "); see also J. Beasley, supra, p. 406 ("[t]he majority position is that state of the art evidence is mere evidence, which can be rejected or accepted in jury deliberations on the ultimate fact of defectiveness as easily as other types of evidence"). In other words, "state of the art relates to the condition of the product and the possibility that it could have been made safer." 1 M. Madden, supra, § 8.3, p. 301. Accordingly, we conclude that state of the art is a relevant factor in considering the adequacy of the design of a product and whether it is in a defective condition unreasonably dangerous to the ordinary consumer. In defining the term state of the art, we adhere to our precedent in *Tomer* and to the majority view, which characterize state of the art as the level of relevant scientific, technological and safety knowledge existing and reasonably feasible at the time of design. See *Tomer* v. *American Home Products Corp.*, supra, 170 Conn. 686–87; see also *Carter* v. *Massey-Ferguson, Inc.*, supra, 716 F.2d 347; *Gosewisch* v. *American Honda Motor Co.*, supra, 153 Ariz. 394; *Montgomery Ward & Co.* v. *Gregg*, supra, 554 N.E.2d 1155–56; *Boatland of Houston, Inc.* v. *Bailey*, supra, 609 S.W.2d 748.

Furthermore, we point out that state of the art refers to what is technologically feasible, rather than merely industry custom. *Chown* v. *USM Corp.*, supra, 297 N.W.2d 221 ("[c]ustom refers to what was being done in the industry; state of the art refers to what feasibly could have been done"). "Although customs of an industry may be relevant . . . because those customs may lag behind technological development, they are not identical with the state-of-the-art." (Citation omitted.) *O'Brien* v. *Muskin Corp.*, supra, 94 N.J. 182. "Obviously, the inaction of all the manufacturers in an area should not be the standard by which the state of the art should

be determined." *Hancock* v. *Paccar, Inc.*, 204 Neb. 468, 479–80, 283 N.W.2d 25 (1979); see also *T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.), cert. denied, 287 U.S. 662, 53 S. Ct. 220, 77 L. Ed. 571 (1932) ("[i]ndeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices"). Accordingly, "[a] manufacturer may have a duty to make products pursuant to a safer design even if the custom of the industry is not to use that alternative." *O'Brien* v. *Muskin Corp.*, supra, 182–83.

We now apply these principles to the standards for determining design defectiveness that we have addressed in part I of this opinion. Under the ordinary consumer expectation standard, state-of-the-art evidence "helps to determine the expectation of the ordinary consumer." *Bruce* v. *Martin-Marietta Corp.*, 544 F.2d 442, 447 (10th Cir. 1976); see *Robinson* v. *Audi NSU Auto Union*, supra, 739 F.2d 1486 ("defendant could use state-of-the-art evidence to attempt to establish the expectations of a reasonable consumer"); *Brady* v. *Melody Homes Manufacturer*, 121 Ariz. 253, 260, 589 P.2d 896 (App. 1978) (finding state-of-the-art evidence relevant to determining consumer expectations); *Crittenden* v. *Fibreboard Corp.*, supra, 58 Wash. App. 658–59 (concluding state-of-the-art evidence admissible as factor in both consumer expectation and risk-utility analyses).[35] For example, in approving the trial court's admission of state-of-the-art evidence, the court in *Bruce* stated: "A consumer would not expect a Model T to have the safety features which are incorporated in automobiles made today. The same expectation applies to airplanes. [The p]laintiffs have not shown

[35] But see *Morton* v. *Owens-Corning Fiberglas Corp.*, 33 Cal. App. 4th 1529, 1536, 40 Cal. Rptr. 2d 22 (1995) ("[i]t is the knowledge and reasonable expectations of the consumer, not the scientific community, that is relevant under the consumer expectations test").

that the ordinary consumer would expect a plane made in 1952 to have the safety features of one made in 1970." *Bruce* v. *Martin-Marietta Corp.*, supra, 447. In other words, state-of-the-art evidence supplies the jury with a relevant basis on which to determine what the ordinary consumer would expect with respect to safety features available at the time of manufacture.

Furthermore, under the modified consumer expectations standard we have set forth today, such evidence would be admissible as a factor properly to be considered as part of the risk-utility calculus. See *Norton* v. *Snapper Power Equipment*, 806 F.2d 1545, 1549 (11th Cir. 1987) (state-of-the-art evidence is relevant factor in risk-utility analysis); *Fibreboard Corp.* v. *Fenton*, supra, 845 P.2d 1174 ("[s]tate-of-the-art evidence is clearly admissible and is a factor to consider in determining whether a product is defective and unreasonably dangerous due to a defective design"); *Johnson* v. *Salem Corp.*, supra, 97 N.J. 88 ("[s]tate-of-the-art is a relevant factor in considering the adequacy of the design of the product under the risk-utility analysis, including particularly design features relating to safety"); *Patterson* v. *Ravens-Metal Products, Inc.*, 72 Ohio App. 3d 216, 229, 594 N.E.2d 153 (1991) ("state of the art is a factor which a jury may properly consider in determining the issue of whether a product is defective under the risk/benefit standard"). Because state-of-the-art evidence is relevant to set "the parameters of feasibility"; *Lancaster Silo & Block Co.* v. *Northern Propane Gas Co.*, supra, 75 App. Div. 2d 66; the jury is provided with an objective standard by which to gauge the product's risks and utility. In this respect, such evidence is a relevant factor on both sides of the risk-utility equation: the risks that the product presents to consumers in light of the availability of other safety measures, and the utility of the product in comparison to feasible design alternatives. See *Johnson* v. *Salem Corp.*, supra, 97 N.J.

88–89 (analyzing relevance of state-of-the-art evidence to risk-utility analysis). Accordingly, state-of-the-art evidence constitutes one of several relevant factors to assist the jury in determining whether a reasonable consumer would consider the product design unreasonably dangerous.

In summary, we agree with the defendants insofar as they argue that the trial court improperly limited the applicability of state-of-the-art evidence to the plaintiffs' failure to warn claims. In our view, state-of-the-art evidence is relevant to the determination of whether a particular product design is unreasonably dangerous. We disagree with the defendants' contention, however, that proof of compliance with the state of the art constitutes an affirmative defense to a design defect claim.

We emphasize that although state-of-the-art evidence may be dispositive on the facts of a particular case, such evidence does not constitute an affirmative defense that, if proven, would absolve the defendant from liability. *Crispin* v. *Volkswagenwerk AG*, 248 N.J. Super. 540, 554, 591 A.2d 966 (1991); see *Boatland of Houston, Inc.* v. *Bailey*, supra, 609 S.W.2d 749 n.3 ("[t]his opinion, insofar as it holds that certain evidence of the state of the art is admissible on the issue of defectiveness in product design cases, is not intended to suggest that such evidence constitutes a defense, such as do misuse and assumption of the risk"). In other words, compliance with state of the art would not, as a matter of law, warrant a judgment for a defendant. *O'Brien* v. *Muskin Corp.*, supra, 94 N.J. 183–84. For this reason, we believe that state-of-the-art evidence is "better characterized as rebuttal evidence than as a defense." *Owens-Corning Fiberglas Corp.* v. *Caldwell*, 818 S.W.2d 749, 752 (Tex. 1991).

We therefore conclude that state-of-the-art evidence is merely one factor for the jury to consider under either

the ordinary or modified consumer expectation test. Accordingly, if on remand the trial court concludes that sufficient evidence has been produced to warrant an instruction, the jury may properly consider the state of the art in determining whether the defendants' tools were defectively designed and unreasonably dangerous.

## IV

We also address two issues that the plaintiffs have raised in their cross appeal that are likely to arise on retrial.[36] The plaintiffs argue that the trial court: (1) unfairly prejudiced their claim for punitive damages by excluding evidence, based on a misrepresentation of the parties' stipulation, of the number of other persons who allegedly had been injured by the defendants' tools; and (2) improperly permitted the jury to view irrelevant and prejudicial videotapes of the defendants' manufacturing process, which included narration concerning the defendants' quality control measures and safety testing procedures.[37]

## A

We begin with the plaintiffs' claim that the trial court unfairly prejudiced their claim for punitive damages by

[36] Relying on *Pietrorazio* v. *Santopietro*, 185 Conn. 510, 441 A.2d 163 (1981), the defendants argue that because the plaintiffs failed to file a motion to set aside the verdict, they are limited to plain error review of the cross appeal issues. We note that this court overruled that precedent in *Santopietro* v. *New Haven*, 239 Conn. 207, 220–21, 682 A.2d 106 (1996). Because these issues were raised during trial; see footnote 38 of this opinion; they are proper for review.

[37] The plaintiffs also argue that the trial court improperly refused to issue a curative instruction when, during closing argument, defense counsel suggested that the plaintiffs had failed to produce an expert witness to testify that the tools were defective, even though the trial court had granted the defendants' motion in limine precluding the plaintiffs from offering expert opinion evidence on that issue. Because this issue is unlikely to arise on retrial, we decline to address it.

Additionally, the plaintiffs argue that the trial court improperly allowed the defendants to present irrelevant and prejudicial evidence with respect to Electric Boat's safety practices. We agree with the defendants, however,

excluding evidence, based on a misrepresentation of the parties' stipulation, of the number of other persons who allegedly had been injured by the defendants' tools. The defendants argue that the trial court properly excluded the evidence based upon its interpretation of the stipulation, which did not address whether the plaintiffs would be permitted to elicit testimony with respect to the specific number of persons allegedly injured by the defendants' tools.[38] We agree with the plaintiffs.

The following additional facts are relevant to this issue. Prior to trial, the parties entered into a stipulation with respect to the admissibility of certain evidence. The stipulation provides in relevant part: "(1) The plaintiff, Joseph Gladu, shall not make any reference to the fact that there are 228 other plaintiffs with lawsuits pending against Chicago Pneumatic Tool Company, Dresser Industries, Inc., and Stanley [Works].

"(2) The plaintiff, Joseph Gladu, shall be permitted to elicit testimony from his treating physicians and medical experts that they have examined or treated other individuals with symptoms similar to Joseph Gladu's, some of whom work or have worked at the Electric Boat facility in Groton, Connecticut."

The plaintiffs presented the testimony of Martin Cherniack, a faculty member of Yale School of Medicine and

that this issue has not been properly preserved for review. Accordingly, we need not address that claim.

[38] The defendants further claim that the plaintiffs: (1) failed to brief this issue adequately; and (2) failed to preserve the record by making an offer of proof. We are not persuaded.

In our view, the plaintiffs' argument, albeit brief, adequately sets forth both the relevant factual basis and legal authority. See Practice Book § 4064C; cf. *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 300, 589 A.2d 337 (1991) (thirteen issues presented in "shotgun approach" not considered where not adequately briefed). Furthermore, because the plaintiffs' counsel informed the trial court as to the nature and purpose of the testimony, which is amply disclosed in the record, we con-

director of the Occupational Health Clinic in Groton. During an in limine hearing before the trial court, the plaintiffs sought to present evidence that, based on epidemiological studies Cherniack had performed in 1987, there was a 70 percent incidence rate of hand arm vibration syndrome at Electric Boat. The defendants argued that such testimony was not within the scope of the parties' stipulation. The trial court ruled: "I still think you should stick to your stipulation that he did treat other individuals with symptoms similar to Joseph Gladu, some of whom work or have worked at Electric Boat and just leave it at that, not get into any percentages or any numbers or anything else." The trial court further stated, "that's a well worded stipulation and you ought to abide by it literally and I think it will be fair to everybody." The plaintiffs properly objected to the trial court's ruling.

During direct examination of Cherniack, the court, upon objection by the defendants, excluded evidence of epidemiological surveys of hand arm vibration syndrome performed by Cherniack based on the individuals he had examined from Electric Boat and other employers.[39]

clude that an offer of proof was unnecessary. *Hartmann* v. *Black & Decker Mfg. Co.*, 16 Conn. App. 1, 13 n.9, 547 A.2d 38 (1988).

[39] In response to the question of the plaintiffs' counsel on direct examination, "Doctor, how many individuals have you seen and personally treated who have hand arm vibration-type syndrome," the following colloquy took place:

"[Defense Counsel]: I'll object, Your Honor. That's precisely what we discussed this morning.

"[Plaintiffs' Counsel]: I don't think it is at all. It's simply a question as to—

"[Defense Counsel]: I thought we had a very definite understanding and ruling from the court so we would not have to interrupt the doctor's testimony.

"The Court: I don't think so. He said how many has he seen, it doesn't say from where.

"[Defense Counsel]: I don't think that's the issue. I think the very specific instruction, if Your Honor would refer to the document—

"The Court: That's what I'll do. Would you hand that to me, please, that stipulation. . . . I'm going to give the jury—You can take your recess now

The plaintiffs asserted that the defendants' reading of the stipulation was not in accordance with their agreement. The trial court instructed Cherniack that he could testify that he had "looked at a number of other people without mentioning how many." Subsequently,

while we discuss this matter. Jury may be excused. . . . I have the stipulation. This says that the plaintiff[s] shall be permitted to elicit testimony from treating physicians and medical experts that they have examined or treated other individuals with symptoms similar to Joseph Gladu's, some of whom work or have worked at the Electric Boat facility. Now, your question was what, again?

"[Plaintiffs' Counsel]: I asked him simply how many such individuals. I wasn't asking where those individuals came from.

"[Defense Counsel]: Judge, I thought we had a very specific understanding of that. There was a colloquy with the court on the record about that that we were not getting into numbers, we were not getting into percentages, and we were not getting into prevalences. Your Honor said there's a very well drafted understanding here and that that's what they should stick to. Now, he gives—[plaintiffs' counsel] asked a question where he clearly was going beyond the parameters of our agreement and this is a second effort to go beyond the parameters of the understanding.

"The Court: Would you repeat the question again.

"[Defense Counsel]: Why don't we have it read back. I want to hear the question.

"[Plaintiffs' Counsel]: My question simply was, Your Honor, how many individuals which were suffering from hand arm vibration syndrome has Dr. Cherniack seen. I don't know how that's—

"The Court: How is that—

"[Defense Counsel]: It's designed to elicit a number and exactly the basis of our earlier objection because the doctor was earlier attempting to testify in response to questions about this epidemiological study, and the sole purpose of that was to elicit in front of the jury that he has seen a certain number of people. The focus of his work has been Electric Boat, so the inference of this question is that he has seen these people primarily from Electric Boat.

"The Court: Would you answer the question, doctor. Do you recall what it was?

"The Witness: Better repeat it.

"The Court: Ask it again.

"[Plaintiffs' Counsel]: Doctor, how many treated—individuals have you treated over the years suffering from hand arm vibration syndrome?

"The Witness: Well, I've seen thousands of people with the diagnosis or coming in with symptoms.

"The Court: Symptoms similar to the plaintiffs', is what we're talking about here?

Cherniack commented on cross-examination that, "after looking at some 600 of these tests, there's certain patterns that come out." Outside the presence of the jury, the trial court cautioned Cherniack that he may

"The Witness: That's a more respective number. Probably on the order of about 600.

"The Court: I don't know.

"[Defense Counsel]: Your Honor, I think in the stipulation what it's basically saying is to allow the doctor to establish that he's qualified to treat in this area. He can suggest that he has treated other people. Once you start talking about 300 or 600 or that type of thing then we get into numbers. Clearly his primary work has been [at] Electric Boat. It doesn't take a jury a whole lot to understand that if he's treated 600 people, all of them or most of them—I think the spirit of what we're trying to do and I think—thought we had an agreement and it is being violated, quite frankly. I think that it's clear by that kind of a question—something that's clear by that kind of a question that that's going to bring a percentage answer or number and is in violation of that stipulation.

"[Plaintiffs' Counsel]: The stipulation—

"The Court: One at a time. You can tell him what to say but only one on direct.

"[Defense Counsel]: The difficulty this raises, judge, is then we have to explore all of these other cases if he's going to testify that he has all of this experience. The doctor has been clearly established and [plaintiffs' counsel] went through great length that he's had a lot of experience with a lot of people, he's established that the doctor is qualified to [render] opinions about the plaintiffs in this case.

"If we get into 600 people, we have to get into how do those people compare with these people, we get into all of those collateral matters. They are prejudicial to the defendants in this case inasmuch as we are only defending these five cases.

"The Court: Well, I'm afraid the agreement doesn't specifically address the question of how many. It said he can testify he treated other individuals with symptoms similar to the plaintiffs, some of whom worked at Electric Boat. They didn't say whether he can or can't say how many.

"[Plaintiffs' Counsel]: Well, judge, it says what it says.

"The Court: I know it doesn't answer—it doesn't address the question.

"[Defense Counsel]: The plaintiffs are limited to the industry.

"The Court: I'm saying the agreement doesn't address the question of how many people. It says he can say—it doesn't say he can't say how many.

"[Defense Counsel]: Judge, if we were going to permit them to elicit that type of testimony, then we would not have drafted the stipulation in this fashion. That's the sole purpose of this.

"The Court: Well, all right. Let me look. Paragraph two doesn't really address the question. However, maybe paragraph one will be of help; that

testify that he had "looked at a number of other people without mentioning how many."

"It is well established that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987). The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. *State* v. *Avis*, 209 Conn. 290, 298, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989)." (Internal quotation marks omitted.) *State* v. *Bruno*, 236 Conn. 514, 549, 673 A.2d 1117 (1996).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with

---

says that the plaintiff shall not make any reference to the fact that there are 228 other plaintiffs with lawsuits. All right. So, maybe paragraph one would suggest that no numbers—

"[Plaintiffs' Counsel]: That's a very specific one. That related specifically to the idea we could not put on evidence relating to other claims, which of course would open up an entirely different issue which is a collateral issue whether or not those cases were exactly the same as the cases that were on trial today.

"That was my understanding that we would be entitled to ask the doctor general questions relating to his background including studies he performed in the shipyard. Your Honor read the stipulation to the contrary.

"The Court: Paragraph two doesn't mention numbers. They examined—If I asked if he had seen other individuals, that would not be objectionable. If I asked how many—

"[Defense Counsel]: That's the basis of our—

"[Plaintiffs' Counsel]: Provided I don't ask what percentage were in the shipyard.

"[Defense Counsel]: That puts the focus of his work in Groton, Connecticut since 1986, which has been the Groton Electric Boat facility.

"The Court: Well, I think paragraph one answers the question which I think paragraph two maybe left a little ambiguous, so I think I would have to rule you can't ask him about any numbers and ask him did he treat other people with similar symptoms some of whom work or who have worked at Electric Boat, but not get into any numbers at all. That's probably the spirit of this stipulation. You can never get anything perfect apparently."

other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 305–306, 664 A.2d 743 (1995).

The admissibility of the evidence at issue is governed by the parties' trial stipulation. The standard for interpreting a trial stipulation is well settled. "[A] stipulation . . . must be construed according to the intention of the parties as expressed in the language used in the document itself, rather than according to the intention which may have existed in the mind of either of the parties." *Foley* v. *Foley*, 149 Conn. 469, 471, 181 A.2d 607 (1962); see *Rosenfield* v. *Metals Selling Corp.*, 229 Conn. 771, 780, 643 A.2d 1253 (1994). When the "intent of the parties is clear in the stipulation, intent is a matter of law, rather than a question of fact. See *Zadravecz* v. *Zadravecz*, 39 Conn. App. 28, 31, 664 A.2d 303 (1995)." *Legg* v. *Legg*, 44 Conn. App. 303, 306, 688 A.2d 1354 (1997). "Absent a clearly expressed intention of the parties, the construction of a stipulation is a question of fact committed to the sound discretion of the trial court. See *Central Connecticut Teachers Federal Credit Union* v. *Grant*, 27 Conn. App. 435, 437, 606 A.2d 729 (1992)." *Rosenfield* v. *Metals Selling Corp.*, supra, 780.

In our view, the parties' intent was clearly expressed as a matter of law, and the trial court abused its discretion in excluding Cherniack's testimony regarding the number of persons with symptoms similar to those of

the plaintiffs. The parties stipulated that the plaintiffs could not make reference to the fact that numerous other individuals had actions pending against the defendants. The parties further stipulated that "[t]he plaintiff, Joseph Gladu, *shall be permitted* to elicit testimony from his treating physicians and medical experts that they have examined or treated *other individuals* with symptoms similar to Joseph Gladu's . . . ." (Emphasis added.) We conclude that the language of the parties' stipulation is plain and unambiguous. Although the stipulation precludes the plaintiffs from referring to the number of individuals who were bringing actions against the defendants, it allowed the plaintiffs to present evidence with respect to the number of persons with similar symptoms. Accordingly, because we find that the intent of the parties is clear as evidenced by the language of the stipulation, we conclude that the trial court incorrectly interpreted its terms.

Having determined that the trial court misinterpreted the parties' stipulation as a matter of law, we next determine whether the evidence at issue was relevant. As part of the punitive damages claim, the plaintiffs raised the issue of the defendants' reckless disregard for the safety of the plaintiffs and others. See General Statutes § 52-240b ("[p]unitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product"). In our view, evidence of the number of persons injured by the defendants' tools was relevant to the plaintiffs' punitive damage claim. We therefore conclude that the trial court abused its discretion in prohibiting the plaintiffs from placing evidence of the number of persons injured by the defendants' tools before the jury.

We note that, in light of the trial court's misinterpretation of the parties' stipulation, the court never had the

opportunity to balance the probative value of the evidence against its prejudicial effect. On remand, if the trial court concludes that the probative value of the evidence is not outweighed by its prejudicial effect; *Berry* v. *Loiseau*, 223 Conn. 786, 804, 614 A.2d 414 (1992); the trial court may properly admit the evidence for consideration by the jury.

### B

The plaintiffs' final claim is that the trial court improperly permitted the jury to view irrelevant and prejudicial videotapes of the defendants' manufacturing process, which included narration concerning the defendants' quality control measures and safety testing procedures. In response, the defendants assert that the evidence relating to the defendants' safety practices rebutted the plaintiffs' claim that the defendants had acted with reckless disregard in supplying the tools to the plaintiffs. We agree with the plaintiffs.

The following facts are relevant to the resolution of this issue. The defendants presented a videotape regarding Dresser's manufacturing process and safety practices, which was accompanied by in-court narration by Tom Hurst, president of Dresser's industrial tool division. Dresser employs vibration testing to comply with engineering specifications, including balance and concentricity of the parts. The videotape also displayed Dresser's metallurgical lab, in which the tools are tested for heat treating and engineering specifications, as well as the inspection department, which tests all tools for quality certification.

The defendants also presented a videotape of Stanley Works' manufacturing process, which demonstrated the use of computer engineering to develop design specifications. The videotape showed that Stanley Works manufactures tool parts by computer aided machining sequences in order to meet specifications. The tool

parts are subsequently subjected to heat treating and cooling. Furthermore, the process includes quality control inspections to ensure that the overall tolerances meet specifications.

The jury also viewed a videotape concerning Chicago Pneumatic's manufacturing process, which begins with the use of computer aided design systems. Metallurgists test the microstructure and chemical composition of metals to ensure compliance with specifications. The videotape demonstrated that tool parts are machined to exact specifications and then heat treated to achieve the desired level of hardness. Micrometers and other devices are used to test lot dimensions and conformity to design requirements. In order to ensure a perfect fit, the parts are then subjected to a final cleaning by immersing the parts into a special tank that uses sonic waves to agitate the cleaning solvent. The videotape also showed that the parts are hand assembled and then undergo operational tests and final inspection.

Contending that the videotapes were irrelevant and prejudicial, the plaintiffs filed a motion in limine to exclude the videotape presentations. Finding that the videotapes were relevant to the plaintiffs' punitive damages claim, the trial court denied the motion. The trial court stated: "I'm going to allow it. I think when you get into . . . the claims of intentional misrepresentation, fraudulent concealment, and the wilful, wanton, malicious manner, et cetera, it opens up the door to almost anything by way of defense."[40]

---

[40] With respect to the admissibility of the videotapes, the following colloquy between counsel and the trial court took place:

"The Court: Now, and what is your claim? I've read your brief. Basically, you seem to say first that the manufacturing quality and so on basically is not the issue. That you don't quarrel that they made a good tool. The quarrel is that they didn't put dampening devices on for vibration. Is that basically what you—

"[Plaintiffs' Counsel]: That is precisely what we are claiming, Your Honor. We don't dispute that these are well made tools, built to most tolerances.

"The rules for determining the admissibility of evidence are well settled. The trial court has broad discretion to determine both the relevancy and remoteness of evidence. . . . Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings

And this particular video does not have an audio portion. My understanding is that Mr. Hurst would supply a narration, but, I believe by having viewed the video that it shows the factory and the engineering and the computer aided design that goes into the design of the tools. And I don't believe that any of those are issues that are in dispute in the case. I think they just add a number of collateral issues and add nothing of probative value.

"The Court:—Well, as I understand it and again from cases that you have cited and other cases that that is not an issue in a product liability case, that it was a well made product. The question is was it unreasonably dangerous or defective in design or unreasonably dangerous to the user are the only issues. But, I think I should hear from [defense counsel].

"[Defense Counsel]: Your Honor, if I might, please, the allegations in this complaint and the testimony that we heard—first of all, if you can recall there was testimony on the Stanley [Works] tools and there was testimony while [Alexander] was on the stand concerning the cut away versions of those tools and how difficult it would be from a feasibility perspective to supply the kind of devices that are being talked about by [Alexander] and to some extent by [Suggs] with respect to the wraps and the sleeves over the top of the tool. So, I would suggest to the court, first of all, that the movie is nothing more than a walk through the plant to show the manufacturing sections, the engineering sections, and that type of thing. What I would make a claim for, Your Honor, is first of all, we intend to put on evidence that the devices suggested by these gentlemen are not feasible. That in a manufacturing and the engineering process of these tools that those kinds of devices are not feasible and that they are impractical in the work place. The manufacturing and the design of the tool, the testimony that will be elicited on that is necessary on that feasibility issue. . . .

"[Plaintiffs' Counsel]: Thank you. Your Honor, all of the discussions regarding tools other than grinders all related to the vibration hazard. And that is the sense in which they are relevant, not in terms of any other safety feature regarding those tools.

"With regard to the attitude of the companies, we are not raising any issue or making any claim regarding the attitude or conduct of these companies with regard to any safety hazard other than the vibration hazard. And what they may or may not have done with regard to other features of the tools are simply not relevant and are going to represent a waste of the court's time and introduce numerable—numerous collateral issues, Your Honor.

"With regard to the video, to return to it a minute. I viewed the video and I heard [defense counsel's] comments. There is nothing in that video that relates to the dampening, isolation or weighted sleeve vibration reduction

on evidentiary matters. . . . In considering the relevancy of evidence, we ask whether it tends to establish the existence of a material fact or to corroborate other direct evidence in the case. . . . Because there is no precise and universal test of relevancy, however, the question must ultimately be addressed on a case-by-case basis in accordance with the teachings of reason and judicial experience." (Citations omitted; internal quotation marks omitted.) *Dunham* v. *Dunham*, 204 Conn. 303, 324, 528 A.2d 1123 (1987).

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. *Berry* v. *Loiseau*, [supra, 223 Conn. 804]; *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 191–92, 510 A.2d 972 (1986). We have identified at least four circumstances where the prejudicial effect of otherwise admissible evidence may outweigh its probative value: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the [party against whom the evidence has been offered], having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared

---

techniques which the plaintiffs' engineers have testified about. So, I still would argue, Your Honor, that the video is irrelevant to any of the issues that have been raised in the case.

"The Court: Well, I'm going to allow it. I think when you get into the wilful, wanton, the claims of intentional misrepresentation, fraudulent concealment, and the wilful, wanton, malicious manner, et cetera, it opens up the door to almost anything by way of defense. And, of course, this is as [defense counsel] indicated preliminary for other testimony just to show the . . . manufacturing process. I think that in this case, it's—this is a little different than the ordinary case, I think, of a product liability because of these specific allegations made both in the first count and the second and third counts. So, I'm going to allow it."

to meet it. *State* v. *DeMatteo*, 186 Conn. 696, 702–703, 443 A.2d 915 (1982); *State* v. *Greene*, 209 Conn. 458, 478–79, 551 A.2d 1231 (1988)." (Internal quotation marks omitted.) *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 193, 646 A.2d 195 (1994).

With these principles in mind, we proceed to the plaintiffs' claims. Although we are mindful of the trial court's broad discretion in determining the admissibility of evidence; *Dunham* v. *Dunham*, supra, 204 Conn. 324; we nevertheless conclude that the trial court abused its discretion in admitting the videotapes into evidence. Here, the plaintiffs' punitive damages claim alleges that the defendants acted with reckless disregard in providing the tools that the plaintiffs had used between 1976 and 1987. In order to rebut the claim of reckless disregard, the defendants offered videotapes that were produced in 1992. Because the videotapes depict the defendants' manufacturing processes and safety practices years after the time period in question, absent a showing by the defendants that these processes and practices were substantially the same as those employed between 1976 and 1987, we conclude that they are irrelevant to the issue of whether the defendants acted with reckless disregard in selling the tools used by the plaintiffs between 1976 and 1987. See *Hall* v. *Burns*, 213 Conn. 446, 464, 569 A.2d 10 (1990) (concluding that trial court properly excluded postaccident photograph because it was irrelevant to plaintiff's claim).

Additionally, the videotapes highlight the defendants' manufacturing processes, which are completely irrelevant to the plaintiffs' design defect claim. We agree with the Oregon Court of Appeals, which recently addressed this precise issue in *Lakin* v. *Senco Products, Inc.*, 144 Or. App. 52, 70, 925 P.2d 107 (1996), in which the defendant attempted to present a videotape of its manufacturing process to rebut a claim of reckless disregard in

selling defectively designed products. In *Lakin*, the court stated: "Whether [the] defendant showed care in the manufacturing process and tested completed [products] to determine that they operated as designed was irrelevant to [the] plaintiffs' allegations of defective design and inadequate design-related research and testing, which, ultimately, underlay their claim of 'wanton disregard.' " Id., 71. Similarly, in this case, the videotapes' focus on the defendants' manufacturing processes is not relevant to rebutting the plaintiffs' claim that the defendants acted with reckless disregard in selling defectively designed tools.

Furthermore, even if we were to find that the videotapes were marginally relevant, their probative value nevertheless is outweighed by their prejudicial effect. See *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, supra, 231 Conn. 193. The videotapes' extensive discussion of the defendants' concern for unrelated safety issues, including sound testing, heat treating and corrosion resistance, creates "side issue[s] that will unduly distract the jury from the main issues." (Internal quotation marks omitted.) Id. We therefore conclude that the trial court abused its discretion in admitting the videotape evidence of the defendants' manufacturing processes and safety practices.

## V

In summary, on the defendants' appeal, we conclude that: (1) the plaintiffs need not prove a feasible alternative design as an absolute requirement to establishing a design defect claim; (2) with respect to the defendants' alteration/modification defense, the trial court improperly imposed a more rigorous standard of proof on the defendants than is required by law; and (3) the trial court improperly limited the admissibility of state-of-the-art evidence to the plaintiffs' failure to warn claim. On the plaintiffs' cross appeal relating to the punitive

damages claim, we conclude that the trial court: (1) misinterpreted, as a matter of law, the parties' stipulation relating to evidence of the number of persons with symptoms similar to those of the plaintiffs; and (2) improperly allowed the defendants to present irrelevant videotapes of their manufacturing processes.

The judgment is reversed and the case is remanded for a new trial on the design defect claim and the punitive damages claim in connection with the design defect claim.

In this opinion BORDEN, NORCOTT and PALMER, Js., concurred.

BERDON, J., concurring. I write separately with respect to part I of the court's opinion regarding the test for determining whether a manufacturer is liable for a design defect. I would not depart from our long-standing rule that the *consumer expectation test* must be employed—that is, the product "must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." 2 Restatement (Second), Torts § 402A, comment (i) (1965). Although the court today agrees that this test is to be applied to cases such as the present case, it adopts, by way of dicta, another test for "complex product designs."

I am concerned about the court adopting a *risk-utility test*[1] for complex product designs—that is, a test where the trier of fact considers "the product's risks and utility and then inquires whether a reasonable consumer would consider the product unreasonably dangerous." Adopting such a test in a factual vacuum without the predicate facts to address its full implications can lead

---

[1] This test is sometimes referred to as the "danger-utility test." See W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 99, p. 699.

us down a dangerous path.[2] More importantly, adopting such a risk-utility test for "complex product designs" sounds dangerously close to requiring proof of the existence of "a reasonable alternative design,"[3] a standard of proof that the court properly rejects today.[4]

Finally, because the court insists on addressing this issue that is not before us, I would at least sort out the burden of proof for the risk-utility test by adopting "a presumption that danger outweighs utility if the product fails under circumstances when the ordinary purchaser or user would not have so expected." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 99, p. 702. Adoption of this presumption would lessen the concern that the risk-utility test undermines one of the reasons that strict tort liability was adopted—"the difficulty of discovering evidence necessary to show that danger outweighs benefits." Id.

---

[2] For example, what are the standards to determine when the product involves a complex design?

[3] See the second tentative draft of the Restatement (Third) of Torts: Products Liability (1995) § 2 (b), p. 12.

[4] For example, as the court points out, one of the factors to be weighed in the risk-utility test is "the cost and feasibility of eliminating or minimizing the risk [that] may be relevant in a particular case."